| | | |
|---|---|---|
| **NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III,** | ) ) ) | **Case No.  5:20-cv-04003-CJW-MAR** |
| Plaintiffs, | ) ) ) ) | **Defendants' Brief in Support of Their Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)** |
| v. | ) ) | |
| **Ryan Lizza** and **Hearst Magazine Media, Inc.,** | ) ) ) | **(Telephonic Oral Argument Requested)** |
| Defendants. | ) ) ) | |

Defendants Ryan Lizza and Hearst Magazine Media, Inc. ("Hearst," together with Lizza, "Defendants") respectfully submit this brief in support of their Motion to Dismiss the Amended Complaint of Plaintiffs NuStar Farms, LLC ("NuStar"), Anthony Nunes, Jr. ("Anthony Jr."), and Anthony Nunes, III ("Anthony III"), *see* ECF No. 28 (the "Amended Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion").

**Table of Contents**

Introduction ........................................................................................................................1

Fact Allegations ..................................................................................................................4

Argument ............................................................................................................................4

    I.    Plaintiffs' Complaint Should Be Dismissed Pursuant to Rule 12(b)(6)
         Because None of the Challenged Statements Are Actionable in Defamation ........4

         A.    Only False, Defamatory, Factual Statements that Are "Of and
              Concerning" Any or All of Plaintiffs Are Actionable ................................5

         B.    Plaintiffs Cannot State a Claim for Defamation as a Matter of Law ..........7

    II.    Plaintiffs, Involuntary Limited Purpose Public Figures, Fail to Plausibly
         Allege that Defendants Made Any of the Challenged Statements with
         Actual Malice .......................................................................................................28

         A.    There Exists a Public Controversy Concerning Congressman
              Nunes's Relationship to His Family Farm ................................................29

         B.    Plaintiffs Are Involuntary Public Figures in Connection with the
              Public Controversy Concerning Congressman Nunes's Relationship to
              His Family's Farm ...................................................................................31

         C.    Plaintiffs Fail to Plead Facts Sufficient to Make Their Allegation of
              Actual Malice "Plausible." .......................................................................34

Conclusion ........................................................................................................................35

# Table of Authorities

**Page(s)**

**Cases**

*Abadian v. Lee*,
117 F. Supp. 2d 481 (D. Md. 2000) .......................................................................... 28

*Abbas v. Foreign Policy Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) ................................................................. 9, 15, 26

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
903 F.2d 1000 (4th Cir. 1990) ............................................................................ 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................... 4, 5, 28

*Bandstra v. Covenant Reformed Church*,
913 N.W.2d 19 (Iowa 2018) ................................................................................. 7

*Barreca v. Nickolas*,
683 N.W.2d 111 (Iowa 2004) ....................................................................... 34, 35

*Bay View Packing Co. v. Taff*,
543 N.W.2d 522 (Wis. Ct. App. 1995) .............................................................. 33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................ 4, 5, 28, 34

*Bertrand v. Mullin*,
846 N.W.2d 884 (Iowa 2014) ........................................................................ 2, 34

*Bierman v. Weier*,
826 N.W.2d 436 (Iowa 2013) ........................................................................... 5, 6

*Biro v. Conde Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012) ................................................................ 28

*Brewer v. Memphis Publ'g Co.*,
626 F.2d 1238 (5th Cir. 1980) ..................................................................... 32, 34

*Brummett v. Taylor*,
569 F.3d 890 (8th Cir. 2009) .............................................................................. 6

*Carson v. Allied News Co.*,
529 F.2d 206 (7th Cir. 1976) ............................................................................ 32

*Chapin v. Knight-Ridder, Inc.*,
   993 F.2d 1087 (4th Cir. 1993) ..........................................................................28

*Cherry v. Des Moines Leader*,
   86 N.W. 323 (Iowa 1901) ...................................................................................7

*Cochran v. NYP Holdings, Inc.*,
   58 F. Supp. 2d 1113 (C.D. Cal. 1998) ...............................................................10

*Craig v. City of Cedar Rapids, Iowa*,
   826 N.W.2d 516 (Iowa Ct. App. 2012)................................................................7

*Dall. Morning News, Inc. v. Tatum*,
   554 S.W.3d 614 (Tex. 2018).............................................................................28

*Dameron v. Wash. Magazine, Inc.*,
   779 F.2d 736 (D.C. Cir. 1985) .........................................................................33

*Deripaska v. Associated Press*,
   282 F. Supp. 3d 133 (D.D.C. 2017) .............................................................27, 28

*Franklin v. Dynamic Details, Inc.*,
   116 Cal. App. 4th 375 (2004) ...........................................................................11

*Gauthier v. Waterloo Cmty. Sch. Dist.*,
   No. C05-2070, 2006 WL 463512 (N.D. Iowa Feb. 24, 2006) .............................34

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)......................................................................2, 29, 31, 34

*Gilman v. Spitzer*,
   538 F. App'x 45 (2d Cir. 2013) ........................................................................21

*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
   398 U.S. 6 (1970)........................................................................................9, 16

*Hogan v. Winder*,
   No. 2:12-CV-123 TS, 2012 WL 4356326 (D. Utah Sept. 24, 2012) ....................28

*Horsley v. Feldt*,
   304 F.3d 1125 (11th Cir. 2002) .....................................................................9, 16

*Hovey v. Iowa State Daily Publ'n Bd., Inc.*,
   372 N.W.2d 253 (Iowa 1985) ............................................................................6

*In re IBP Confidential Bus. Documents Litig.*,
   797 F.2d 632 (8th Cir. 1986) ...........................................................................29

*Int'l Ass'n of United Mine Workers Union v. United Mine Workers of Am.*,
  No. 2:04CV00901, 2006 WL 1183245 (D. Utah May 1, 2006) ..............................................23

*Janklow v. Newsweek, Inc.*,
  759 F.2d 644 (8th Cir. 1985), (8th Cir. 1986) .........................................................................26

*Johnson v. Nickerson*,
  542 N.W.2d 506 (Iowa 1996) ....................................................................................5, 6, 20

*Jones v. Palmer Commc'ns, Inc.*,
  440 N.W.2d 884 (Iowa 1989) ......................................................................................................31

*Lauderback v. Am. Broad. Cos.*,
  741 F.2d 193 (8th Cir. 1984) ...............................................................................................8, 9, 11

*Lee v. Lincoln Nat'l Life Ins. Co.*,
  No. 18-CV-2063-CJW, 2018 WL 5660553 (N.D. Iowa Oct. 31, 2018)................................12

*Lewis v. NewsChannel 5 Network, L.P*,
  238 S.W.3d 270 (Tenn. Ct. App. 2007) ...............................................................................32, 33

*Loeb v. Globe Newspaper Co.*,
  489 F. Supp. 481 (D. Mass. 1980) .......................................................................................13

*Lundell Mfg. Co. v. Am. Broad. Cos.*,
  98 F.3d 351 (8th Cir. 1996) ..............................................................................................6, 10

*Mallory v. S & S Publishers*,
  168 F. Supp. 3d 760 (E.D. Pa. 2016) ..................................................................................17

*Marcone v. Penthouse Int'l Magazine for Men*,
  754 F.2d 1072 (3d Cir. 1985)................................................................................................31

*McBride v. Crowell-Collier Publ'g Co.*,
  196 F.2d 187 (5th Cir. 1952) ...............................................................................................21

*Mechdyne Corp. v. Garwood*,
  707 F. Supp. 2d 864 (S.D. Iowa 2009) ..................................................................................6

*Meeropol v. Nizer*,
  381 F. Supp. 29 (S.D.N.Y. 1974)..........................................................................................32

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)........................................................................................................................7

*Mills v. State*,
  924 F. Supp. 2d 1016 (S.D. Iowa 2013) ...........................................................................7, 25

*N.U. by Amar v. E. Islip Union Free Sch. Dist.*,
    No. 16-CV-4540 (SJF) (ARL), 2017 WL 10456860 (E.D.N.Y. Sept. 15, 2017) ................... 23

*Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*,
    951 F.3d 952 (8th Cir. 2020) ................................................................................... 5

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................... 1, 6

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ................................................................................... 6

*Ramsey v. Fox News Network, L.L.C.*,
    351 F. Supp. 2d 1145 (D. Colo. 2005) ................................................................. 5

*Reeder v. Carroll*,
    759 F. Supp. 2d 1064 (N.D. Iowa 2010) ..................................................... 6, 18

*Schuster v. U.S. News & World Report, Inc.*,
    602 F.2d 850 (8th Cir. 1979) ......................................................................... 5, 18

*Smith v. Maldonado*,
    72 Cal. App. 4th 637 (1999) ......................................................................... 7

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ................................................................... 31, 34, 35

*Staff Management v. Jimenez*,
    839 N.W.2d 640 (Iowa 2013) ......................................................................... 22

*Stepanov v. Dow Jones & Co.*,
    987 N.Y.S.2d 37 (2014) ................................................................................... 28

*Stevens v. Iowa Newspapers, Inc.*,
    728 N.W.2d 823 (Iowa 2007) ......................................................................... 27

*Taggart v. Drake Univ.*,
    549 N.W.2d 796 (Iowa 1996) ......................................................................... 6

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017) ......................................................................... 5

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967) ................................................................................... 5

*Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*,
    85 F.3d 383 (8th Cir. 1996) ......................................................................... 27

*United States v. Buckley*,
    525 F.3d 629 (8th Cir. 2008) ...........................................................17

*United States v. Johnson*,
    719 F.3d 660 (8th Cir. 2013) ...........................................................17

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ..........................................................26

*Wiegel v. Capital Times Co.*,
    426 N.W.2d 43 (Wis. Ct. App. 1988) .................................................33

*Wilson v. IBP, Inc.*,
    558 N.W.2d 132 (Iowa 1996) .............................................................6

*Wyo. Corp. Servs. v. CNBC, LLC*,
    32 F. Supp. 3d 1177 (D. Wyo. 2014) ..................................................9

*Yates v. Iowa W. Racing Ass'n*,
    721 N.W.2d 762 (Iowa 2006) ....................................................6, 7, 12

*Zupnik v. Associated Press Inc.*,
    31 F. Supp. 2d 70 (D. Conn. 1998) ....................................................32

**Statutes**

8 U.S.C. § 1324a .........................................................................22, 23

**Other Authorities**

Dan. B. Dodds, *Prosser & Keeton on the Law of Torts* § 116 (Supp. 1988).................................27

Iowa Constitution Art. I, § 7 .............................................................5

## Introduction

Plaintiffs Anthony Nunes Jr. and Anthony Nunes III claim they are "collateral damage" in an article that is really about Congressman Devin Nunes, their son and brother, respectively. Am. Compl. ¶ 15. Congressman Nunes is a quintessential "public official" within the meaning of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Plaintiffs allege in their Amended Complaint that the *Esquire* article, "Devin Nunes's Family Farm Is Hiding a Politically Explosive Secret" (the "Article"), casts doubt on Congressman Nunes's *bona fides* as a conservative Republican and member of the California "agricultural community," which he had always held himself out to be. The Article was quite relevant to Congressman Nunes's California "voter bases," who are "both agricultural and Republican" and who might have been less likely to support the Congressman based on *Esquire*'s reporting. *See* Am. Compl. ¶ 14.

It is black letter law that, in challenging the Article as defamatory, the Congressman himself must plead and ultimately prove, by clear and convincing evidence, that Defendants made the challenged statements with knowledge of their falsity or reckless disregard of falsity, referred to as "actual malice" in the constitutional sense.[1] This exceedingly high burden serves the critical First Amendment function of ensuring that discussion and debate and even criticism about public officials be "uninhibited, robust, and wide-open," and not chilled by fear of crippling liability for misstatements or errors of fact. *Sullivan*, 376 U.S. at 270.

In this case, the Court is presented with the question of whether Plaintiffs—immediate relatives of Congressman Nunes who are inextricably intertwined with the substantial public controversy addressed in the Article—are subject to the same heightened burden of pleading and proving fault. This question of constitutional law is a matter of first impression in the federal

---

[1] Congressman Nunes has instituted his own separate action before this Court challenging the Article. *See* Case No. 5:19-cv-04064-CJW-MAR (N.D. Iowa).

courts of the Eighth Circuit. The Court should answer the question in the affirmative because Plaintiffs are at the least involuntary limited purpose public figures under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). Their business, their conduct, and their status as dairy farmers is part of the persona surrounding their son and brother, the member of Congress. As Iowa Supreme Court Chief Justice Mark Cady wrote in a libel lawsuit involving two political candidates:

> At its core, the First Amendment guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office. While debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution, an election campaign is a means of disseminating ideas as well as attaining political office. Consequently, constitutional protection for political speech in the context of a campaign extends to anything which might touch on an official's fitness for office. Understandably, the range of private conduct that affects an official's fitness for elective office can be broad. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.

*Bertrand v. Mullin*, 846 N.W.2d 884, 893-94 (Iowa 2014) (alteration in original) (citations and quotation marks omitted).

While involuntary limited purpose public figures are rare, they generally fall into one of two camps: Relatives of famous people, and persons who are necessarily part of a story about public officials and public business. This case is remarkable in that Plaintiffs fit in to both categories, presenting the Court with compelling facts to support a finding that Plaintiffs are involuntary limited purpose public figures as to the allegations of the Amended Complaint. This recognition of Plaintiffs as involuntary public figures gives meaning to *Sullivan*'s actual malice standard by ensuring that the press can freely report on important matters concerning prominent public officials where related private persons are necessary components of the story.

Resultingly, because Plaintiffs have failed to plead actual malice with sufficient facts to make their allegation of fault plausible, their claim must be dismissed. *See infra* Point II.

Alternatively, the Court need not reach the issue of fault (and attendant application of the involuntary public figure doctrine) to dismiss this case: None of the 14 challenged statements and one alleged implication set forth in the Amended Complaint are actionable. In their original complaint, ECF No. 1 (the "Original Complaint"), Plaintiffs summarily alleged that 16 statements in the Article were false. On May 12, 2020, the Court ordered Plaintiffs to file a more definite statement. *See* ECF No. 27 (the "Order"). The Order went through the "tedious and laborious exercise of dissecting each of the sixteen bullet points," which showed that "the complaint fails to allege facts which, if proven, would show that any of the alleged facts are false." *Id.* at 19. The Court gave Plaintiffs specific directions on how to plead a claim:

> [F]or defendants to be able to answer the complaint, or for this Court to analyze whether the complaint is subject to dismissal under Rule 12(b)(6) because it fails to state a claim, it is first necessary that the complaint itself be intelligible. The complaint needs to state whether it is alleging specific facts are false, and if so, which ones and why. If plaintiffs' entire theory of recovery is that the article as a whole is defamatory by implication, then the complaint needs to allege which facts or omissions are juxtaposed with other facts or omissions so as to lead to a false assertion of fact, and allege facts which, if proven, would show the implied assertion of fact to be false.

*Id.* at 19-20.

Rather than sharpening their focus to adhere to the Court's instructions, Plaintiffs expand the generalities of the Amended Complaint, proffering up to eight reasons why each of the 14 statements (and 1 implication) they seek to challenge are "false."[2] None of these reasons render the statements actionable. They do not change the fact that the statements are not "of and concerning" Plaintiffs, are not defamatory, are literally or substantially true, and/or are nonactionable opinions. Plaintiffs' Amended Complaint does nothing but compound the tedium

---

[2] Many of these 14 challenged statements overlap with the 16 bullet points in the Original Complaint. Plaintiffs abandoned some statements challenged in the Original Complaint; some challenged statements are new to the Amended Complaint; and others have been modified to include or exclude surrounding text.

3

and labor associated with analyzing their unfocused claims.  The Amended Complaint should be dismissed, with prejudice.  *See* Point I.

## Fact Allegations

To avoid burdening the Court with unnecessary repetition, Defendants incorporate by reference their description of the factual allegations concerning Plaintiffs, Lizza, *Esquire*, the Article at issue, and the filing of the Original Complaint from their Motion to Dismiss the Original Complaint.  *See* ECF No. 18, at 2-6.  The Court is familiar with those allegations, which are reflected in the Court's Order at pages 1-4.  Notably, however, Plaintiffs have added several allegations to the Amended Complaint underscoring their view that the Article was a *political* "hit piece" focused on Congressman Devin Nunes, in which they were "collateral damage."  Am. Compl. ¶¶ 2, 15; *see also id.* ¶ 3 (Article was published to "dirty up Congressman Devin Nunes ahead of the 2018 Congressional Election"); ¶ 14 (alleging that Article may tend to "erode" Congressman Nunes's support among "his voter bases (both agricultural and Republican)"); ¶¶ 16-18 (alleging that Defendants tweeted a link to the Article "each time a major news story broke concerning Devin Nunes," providing examples); *infra* Point II.A.

## Argument

## I. Plaintiffs' Complaint Should Be Dismissed Pursuant to Rule 12(b)(6) Because None of the Challenged Statements Are Actionable in Defamation.

"To survive a motion to dismiss" pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This pleading rule is particularly apt and important in defamation cases targeting political speech.  Courts must be mindful of the chilling effect that costly and protracted litigation can have on speech concerning public officials, and the need to dispose of meritless

4

claims before the burdens of discovery are suffered.  *See Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145, 1153 (D. Colo. 2005).[3]  Although Plaintiffs are not themselves public officials, these concerns apply with equal force here because, as Plaintiffs admit, the Article concerns Congressman Nunes.  Am. Compl. ¶ 14.

The *Twombly*/*Iqbal* standard applies to all the elements of a defamation claim, but is particularly demanding with regard to the constitutional requirements of falsity and fault.  *See* Order at 9 ("[P]laintiffs must allege facts that, if proven, would show the statements to be false." (citing *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017)); *Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) (defamation plaintiff must plead facts sufficient to give rise to a reasonable inference of actual malice).  The Amended Complaint falls short of that demanding standard.

### A.  Only False, Defamatory, Factual Statements that Are "Of and Concerning" Any or All of Plaintiffs Are Actionable.

To state a claim for defamation, Plaintiffs must plead (1) publication (2) of a false statement (3) concerning the plaintiff (4) made with the requisite level of fault (5) that resulted in demonstrable injury to their reputation through its falsity.  *See Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996).  The doctrine of libel *per se* does not apply in defamation cases brought against members of the media.  *See Bierman v. Weier*, 826 N.W.2d 436, 448 (Iowa 2013).  In considering these elements, courts are guided by various principles of common law and First Amendment[4] considerations.  Five salient points are described below.

---

[3]     *See also Schuster v. U.S. News & World Report, Inc.*, 602 F.2d 850, 855 (8th Cir. 1979) ("[T]he Supreme Court has recognized that the cost of defending a protracted lawsuit can chill first amendment rights.") (citing *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("Fear of large verdicts in damage suits . . . , even fear of the expense involved in their defense, must inevitably cause publishers to 'steer wider of the unlawful zone.'") (citations omitted)).

[4]     References in this Brief to the First Amendment include the protection provided under its free speech clause, its freedom of the press provision, and the independent state free speech and free press rights afforded under Art. I, § 7 of the Iowa Constitution.

*First*, the article in question must be read as a whole, and any allegedly defamatory statements must be considered in their context. *See Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 359 (8th Cir. 1996) (applying Iowa law). And any allegedly defamatory statements must be judged objectively from the perspective of an objective reasonable reader. *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 771 (Iowa 2006).

*Second*, the question of whether the statement is capable of a defamatory meaning is a question of law for the Court to decide. *Id.* at 772. "In carrying out this task, a court should not . . . 'indulge far-fetched interpretations of the challenged publication.'" *Mechdyne Corp. v. Garwood*, 707 F. Supp. 2d 864, 875 (S.D. Iowa 2009) (quoting *Yates*, 721 N.W.2d at 771-72).

*Third*, the requirement that the allegedly defamatory statement be "of and concerning" the plaintiff is constitutionally required. *See, e.g.*, *Sullivan*, 376 U.S. at 287; *Brummett v. Taylor*, 569 F.3d 890, 892 (8th Cir. 2009); *Bierman*, 826 N.W.2d at 464-65; *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996). The Court can decide this issue as a matter of law where a reasonable reader could not understand the statement as referring to the plaintiff. *See Reeder v. Carroll*, 759 F. Supp. 2d 1064, 1083 (N.D. Iowa 2010).

*Fourth*, the plaintiff bears the burden of proving falsity, *Johnson*, 542 N.W.2d at 511 n.3—also a constitutional requirement, *see Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986)—and the truth or substantial truth of a statement defeats a defamation claim, *Hovey v. Iowa State Daily Publ'n Bd., Inc.*, 372 N.W.2d 253, 256 (Iowa 1985). Plaintiffs' burden to prove falsity cannot be met by relying on minor inaccuracies. *See Yates*, 721 N.W.2d at 769-70 ("Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance." (citation omitted)). So long as the "gist" or "sting" of the challenged statement is substantially true, there can be no recovery. *See, e.g.*, *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140-

6

41 (Iowa 1996).  Where a complaint admits to the truth of the statement, then this issue may be decided as a matter of law.  *See Smith v. Maldonado*, 72 Cal. App. 4th 637, 652 (1999), *as modified* (June 23, 1999).

*Fifth*, the Constitution protects pure opinion, "rhetorical hyperbole," and any other statements that are not "sufficiently factual to be susceptible of being proved true or false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 21 (1990).  Beyond these constitutional safeguards outlined in *Milkovich*, Iowa courts "utilize a four-part test to determine whether a statement is factual or a protected opinion" as a matter of state law: (1) "whether the alleged defamatory statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous"; (2) "the degree to which the [alleged defamatory] statements are objectively capable of proof or disproof"; (3) "the context in which the alleged defamatory statement occurs"; and (4) "the broader social context into which [the alleged defamatory] statement fits." *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018) (alterations in original) (quotation marks and citations omitted).

In determining whether the statement is protected opinion, courts also consider whether the author has disclosed the facts on which the statement is based.  *See Mills v. State*, 924 F. Supp. 2d 1016, 1034 (S.D. Iowa 2013) (author's "subjective impression[]" of a situation is not actionable if it does not imply the speaker possesses additional, undisclosed facts informing that impression); *Yates*, 721 N.W.2d at 771.  Whether a statement is one of opinion is a question of law for the Court to decide.  *See Craig v. City of Cedar Rapids, Iowa*, 826 N.W.2d 516 (Iowa Ct. App. 2012).  Iowa has been at the forefront of extending this factor to fair comment and criticism.  *Cherry v. Des Moines Leader*, 86 N.W. 323 (Iowa 1901).

## B.  Plaintiffs Cannot State a Claim for Defamation as a Matter of Law.

The challenged statements are not actionable as a matter of law, warranting dismissal

with prejudice of the entire Amended Complaint.  Each statement is discussed below.

1.  *"Devin Nunes's Family Farm Is Hiding a Politically Explosive Secret."*  Am. Compl. ¶ 22(a).

This is the article's headline.  A headline does not exist in a vacuum; it must be read together with the entire article to understand its context and meaning, and the reasonable reader is presumed to read and consider the entire article.  *See Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 196 (8th Cir. 1984).  Indeed, Plaintiffs challenge the headline on the same bases they challenge the various statements in the Article itself,[5] none of which are actionable for the reasons described *infra* Points I.B.2, I.B.3.

The only words that are arguably unique to the headline is the characterization of the "secret" as being "politically explosive."  It's not clear if Plaintiffs are challenging this characterization of the "secret," or just the underlying facts that, Plaintiffs argue, support the characterization.  *See* Am. Compl. ¶ 22(a) ("[T]here was no 'politically explosive' secret . . . .").  If the former, that is addressed *infra* Point I.B.2.  If the latter, that is obviously a non-actionable statement of hyperbolic opinion:  Nothing is poised to detonate, and there is no standard by which a fact finder could objectively determine whether something is "politically explosive."

2.  *"So why did [Devin Nunes'] parents and brother cover their tracks after quietly moving the farm to Iowa? Are they hiding something politically explosive? On the ground in Iowa,* Esquire *searched for the truth—and discovered a lot of paranoia and hypocrisy."*  Am. Compl. ¶ 22(b).

Plaintiffs challenge three sentences in the Article's sub-heading.  None are actionable.

<u>The first two sentences</u> are not actionable for at least three reasons.  *First,* they are

---

5  Plaintiffs allege the headline is false because "(a) NuStar is not 'Devin Nunes's Family Farm'; (b) neither Plaintiffs nor Devin Nunes's family's farm hid anything from anyone; (c) there was no hidden 'secret' as the 'Nunes family dairy of political lore' never moved to Iowa; and (d) there was no 'politically explosive' secret, as NuStar does not employ undocumented labor."  Am. Compl. ¶ 22(a).

questions, which as a matter of law cannot form the basis of a defamation claim. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (Kavanaugh, J.) ("[I]t is generally settled as a matter of defamation law . . . that a question, 'however embarrassing or unpleasant to its subject, is not accusation.'" (citation omitted)).

*Second*, even if these were actionable questions, a statement that Plaintiffs "cover[ed] their tracks," that they are "hiding something," that they made their move to Iowa "quietly," or that they kept the move a "secret" are not defamatory, as a matter of law. Because there is nothing illegal, shameful, or wrong about the fact that Anthony Jr. and Anthony III moved the family farm to Iowa, as a matter of law, it is not defamatory to state that they chose to keep that fact a secret. *See Wyo. Corp. Servs. v. CNBC, LLC*, 32 F. Supp. 3d 1177, 1187 (D. Wyo. 2014). Certainly, no one in Iowa would think less of them for having moved to Iowa.

*Third*, those statements are protected opinion and fair comment. They are obvious hyperbole. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of word "blackmail" to describe actions of public official not actionable "as a matter of constitutional law"); *Horsley v. Feldt*, 304 F.3d 1125, 1133 (11th Cir. 2002) (statement that plaintiff had "conspired with others" nonactionable hyperbole); *Lauderback*, 741 F.2d at 197 (allegation that plaintiff "was dealing unscrupulously with senior citizens, is more analogous to a broad, unfocused, wholly subjective comment than it is to specific accusations of felonious conduct"). Further, these statements are not readily capable of being proven true or false, as they do not have an easily defined meaning (consider: to how many people and in what contexts would Plaintiffs need to disclose the fact of their move such that a fact-finder could definitively and objectively conclude whether they in fact "cover[ed] their tracks," are "hiding something," made their move to Iowa "quietly," or kept it a "secret"?). *See Wyo. Corp. Servs.*, 32 F. Supp. 3d at

1187 (statement that purpose of creating legal entity was to "conceal ownership" was "opinion").

Moreover, the Article's tone and setting as a work of literary journalism written in the author's first-person perspective establish that the challenged statements constitute nonactionable opinion. June 22, 2020 Decl. of Ravi Sitwala ("Sitwala Decl."), Exs. A, B. The tone of the Article, which must be taken as a whole, *Lundell Mfg. Co.*, 98 F.3d at 359, is filled with adjectives and introspective questions revealing Lizza's impressions as he conducted reporting for the Article. A cartoon-style illustration appears at the top of the Article, Sitwala Decl., Exs. A, B., which the hard copy edition previews as being not a traditional news report but rather "A Very Weird Political Thriller," *id.*, Ex. B. These elements align with the author's literary voice.

Together, these cues signal to readers that a verb like "hiding," an adverb like "quietly," an adjective like "secret," or an idiom like "cover[ed] their tracks" are, in the context of the Article, not offered as objective facts but rather the opinion of Lizza as he investigates the piece. *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1121 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000) (statements were opinion considering "the general tenor of the entire work," including dramatic lead paragraph, and sarcasm and figurative language throughout).

Additionally, the constituent facts that support these opinions are disclosed in the Article. Lizza discloses that, "[a]s far as I could tell, until late August, neither Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." Sitwala Decl., Exs. A, B. In announcing that Congressman Nunes would be visiting his district, Congressman King's office issued a press release stating that "Congressman Nunes'[s] family has operated a dairy farm in Tulare County, California for three generations", but "[t]here was no mention that the Nunes family actually lived up the road in Sibley, where they operated a dairy." *Id.* The Article even reports on efforts to keep Devin Nunes's name out of a regional

dairy industry publication's news article on the Nunes family farm in Iowa. *Id.* Clearly, "the factual bases" for the opinion "were revealed" in the Article, and thus readers were free to accept or reject the author's opinion based on their own independent evaluation. *Lauderback*, 741 F.2d at 198; *see also Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 387 (2004).[6]

Plaintiffs now raise three arguments as to why these statements are in fact "false." Am. Compl. ¶ 22(b). None of them remove the statements from the realm of protected opinion.

First, Plaintiffs argue that the statement is false because they "did not 'cover their tracks' and, in any case, there was nothing to 'cover' or hide." Am. Compl. ¶ 22(b). Plaintiffs are just disagreeing with Lizza's opinion. They are welcome to do so—just as all readers are welcome to reach a different opinion based on the disclosed facts, *see Lauderback*, 741 F.2d at 198—but their disagreement does not transform the opinion into a fact.

Next, Plaintiffs argue that the statements are false because their "move to Iowa was a publicized event and a matter of public record—Plaintiffs did nothing to conceal the move." Am. Compl. ¶ 22(b). Elsewhere in their Amended Complaint, Plaintiffs argue that they did not keep the move a secret because, in 2006 or 2007, they threw a "big going away party" when they moved; scrapbooks of California memories were made for them; they sent cards to friends and business colleagues that read "WE MOOOVED"; and, since moving to Iowa, they have been active in the local Sibley community. Am. Compl. ¶ 5. But sending notices to friends and close business colleagues has nothing to do with whether the farm's move has been mentioned in connection with press and election coverage about Congressman Nunes's relationship to his family farming operation, which is the "secret" at issue in the Article. In any event, that Lizza did not disclose facts that *Plaintiffs* consider to be relevant does not transform these statements

---

[6] The reference to "something" being "politically explosive" is also a statement of opinion, for the same reasons stated *supra* Point I.B.1.

Case 5:20-cv-04003-CJW-MAR   Document 34-1   Filed 06/22/20   Page 18 of 44

into facts; all that matters is that he disclosed the facts he relied upon.  *Yates*, 721 N.W.2d at 773

(opinion not actionable where it does not imply provably false fact).[7]

Beyond that, Plaintiffs argue that they "did not move 'the farm' or any farm to Iowa"

because, in fact, "Plaintiffs bought an existing dairy business here in 2006."  Am. Compl.

¶ 22(b).  But that's exactly what the Article reports:

> Devin; his brother, Anthony III; and his parents, Anthony Jr. and Toni Dian, sold
> their California farmland in 2006. Anthony Jr. and Toni Dian, who has also been
> the treasurer of every one of Devin's campaigns since 2001, used their cash from
> the sale to buy a dairy eighteen hundred miles away in Sibley, a small town in
> northwest Iowa where they—as well as Anthony III, Devin's only sibling, and his
> wife, Lori—have lived since 2007.

Sitwala Decl., Exs. A, B.  These facts are not disputed in the Amended Complaint.  With this

detail being expressly disclosed, any reference to moving "the farm" or its operations is

obviously a reference to these undisputed real estate transactions in 2006 and 2007, and the

family's move in 2007—not that any reasonable reader would believe that the family physically

transported acres of earth and the chattels thereon from California to Iowa, anyway.[8]

With regard to the third sentence, the Court observed that "[w]hether *Esquire* searched

for the truth seems a matter of opinion."  Order at 10.  The Court's observation is correct.

Whether *Esquire* "searched for the truth" is not capable of being objectively proven true or false,

and the facts on which that statement is based are apparent from the face of the Article, which

---

[7]     The Amended Complaint also points to other facts that Lizza *did* disclose, like (i) the
existence of the *Dairy Star* article about Plaintiffs moving to Iowa (the Amended Complaint
includes a hyperlink to the URL from which the *Dairy Star* article has been removed), (ii) Devin
Nunes's FEC filings that disclosed his mother's Sibley address, and (iii) Anthony Jr.'s support
for local Republican politicians.  *See* Am. Compl. ¶ 5.  These facts didn't alter Lizza's opinion.
Plaintiffs are welcome to take issue with how much weight Lizza assigned to these facts, but
they do not make Lizza's statements any less statements of opinion.
[8]     The real estate transactions are matters of public record, which the Court can consider in
connection with motion to dismiss.  Sitwala Decl., Ex. C; *see Lee v. Lincoln Nat'l Life Ins. Co.*,
No. 18-CV-2063-CJW, 2018 WL 5660553, at *2 (N.D. Iowa Oct. 31, 2018) (Williams, J.) ("In
ruling on a Rule 12(b)(6) motion to dismiss, the Court may consider . . . 'matters of public record
. . . .'" (citations and quotations marks omitted)).

discloses Lizza's reporting in the Article, as stated from Lizza's first-person perspective. In any event, a statement regarding *Esquire*'s reporting is not "of and concerning" Plaintiffs at all.[9]

The Court also observed that "whether *Esquire* discovered facts that led it or anyone else to conclude that there was some or a lot of something considered to be paranoia or hypocrisy" also "appears generally to assert an opinion." Order at 10. This is, again, correct. Alleging that someone is "paranoid" or "hypocritical" is a classic example of opinion. *See Loeb v. Globe Newspaper Co.*, 489 F. Supp. 481, 486 (D. Mass. 1980) (statement that plaintiff "runs a paper by paranoids for paranoids" is protected opinion). All of the constituent facts that support this opinion are disclosed in detail over the course of the 68-paragraph Article. No reasonable reader would understand the reporting that Lizza observed "paranoia" to be an actual diagnosis of some "mental[] ill[ness]," as Plaintiffs allege. Am. Compl. ¶ 22(a); *see Loeb*, 489 F. Supp. at 486.

3. *"So here's the secret: The Nunes family dairy of political lore—the one where his brother and parents work—isn't in California. It's in Iowa. Devin; his brother, Anthony III; and his parents, Anthony Jr. and Toni Dian, sold their California farmland in 2006. Anthony Jr. and Toni Dian, who has also been the treasurer of every one of Devin's campaigns since 2001, used their cash from the sale to buy a dairy eighteen hundred miles away in Sibley, a small town in northwest Iowa where they—as well as Anthony III, Devin's only sibling, and his wife, Lori—have lived since 2007 . . . [W]hat is strange is that the family has apparently tried to conceal the move from the public—for more than a decade."* Am. Compl. ¶ 22(c).

Plaintiffs allege that "[t]hese statements are false because":

(a) there is no "secret" – the "Nunes family dairy of political lore" is in California and has always been there; (b) the Nunes family dairy was never sold; (c) Anthony, Tony and Dian do not work at the Nunes family dairy; (d) Devin Nunes never

---

[9]     Plaintiffs allege that Defendants were not "in search of the truth" because "they took a preconceived storyline from political operatives and consciously set out to manufacture evidence to conform to the preconceived story." Am. Compl. ¶ 22(b). Elsewhere in the Amended Complaint, Plaintiffs allege in a footnote that "[t]he false storyline – that the Nunes family dairy moved to Iowa – was created by Fusion GPS or other political operatives and fed to select media sympathizers, including Blair Bess and McClatchy (publisher of the Modesto Bee), in August 2018." Am. Compl. ¶ 5 n.2. Whether or not this is true, it has nothing to do with Defendants, and Plaintiffs do not allege that it does. In fact, the Article is transparent that Lizza did substantial original reporting for the Article, including days of on-the-ground reporting in Iowa.

13

owned any "California farmland" with his father and mother; (e) Tony and Dian bought an existing dairy in Sibley; and (f) neither Anthony, Tony nor Dian ever did or said anything to anyone to conceal the move to Iowa from the public – in fact, they did the opposite.

Am. Compl. ¶ 22(c).  Reasons (e) and (f) are addressed *supra* Point I.B.2.  As for reason (d), reporting that Congressman Nunes sold farmland in California is neither defamatory nor of and concerning Plaintiffs—although it appears to be demonstrably true, based on public records. Sitwala Decl., Ex. C.  As for reasons (a) through (c), Plaintiffs' grievance appears to be that it is not accurate to say that the farming operation of Congressman Nunes's parents and brother is the Congressman's "family farm."  In a footnote, Plaintiffs attempt to redefine the "family farm"— they argue that the "family farm" was originally "owned by [Anthony Jr.'s] parents"; that "Devin Nunes started working with his uncle Gerald Nunes" on that farm "[a]fter [Anthony Jr.]'s father died"; and that, "[a]s of September 30, 2018, Gerald continued to manage the Nunes family farm in California . . . ."  Am. Compl. ¶ 5 n.1.

Plaintiffs' efforts to redefine Congressman Nunes's "family farm" are to no avail.  The Article makes clear that, when referring to the "family farm," it is referring to "the one where his brother and parents work," *i.e.*, Congressman Nunes's immediate family.  Sitwala Decl., Exs. A, B.  Plaintiffs are his family, and they farm.

Further, the Article expressly distinguishes the family farm from the one owned by Congressman Nunes's uncle, which the Article reports is located in Tulare, California.  *Id.* Moreover, Congressman Nunes alleges in his own amended complaint in his parallel case in this Court that, "[f]rom childhood, he worked on a farm that his family operated in Tulare County, California." Case No. 5:19-cv-04064-CJW-MAR, ECF No. 23 ¶ 4.  The Congressman's name appears on the deed transferring the property in Tulare to McCarthy Farms.  Sitwala Decl., Ex. C.  To the extent Congressman Nunes ever worked on his Uncle Gerald's farm "[a]fter [Anthony

Jr.]'s father died," that would have been sometime after 1996, which would be when Congressman Nunes was 23 years old and thus after "childhood" years. *See* Sitwala Decl., Ex. D (obituary); Case No. 5:19-cv-04064-CJW-MAR, ECF No. 23 ¶ 4 (Devin Nunes was "[b]orn [on] October 1, 1973"). It is accurate to describe the farm owned and operated by Congressman Nunes's father as the "family farm." In any event, it is not defamatory to report that Congressman Nunes's "family farm" moved to Iowa. Even if Congressman Nunes—Plaintiffs' son and brother, respectively—had not farmed with them in California before they moved to Iowa, it would not lower Anthony Jr.'s or Anthony III's reputation to report that he had done so.

4.  *Devin Nunes' "immediate family's farm—as well as his family—is long gone."* Am. Compl. ¶ 22(d).

Plaintiffs allege that these statements are false because "(a) Devin Nunes' family, including his wife, children, grandmother, uncles and aunts, cousins, and many other relatives all live in California; (b) Tony, Dian and Anthony did not move any farm from California to Iowa; and (c) Tony, Dian and Anthony retain significant farming interests in California." With regard to reason (a), the challenged statement does not report any of these facts. What it does report is the location of Devin Nunes's "*immediate*" family farming operation—the farming operation of his parents and brother—and there is no dispute that it moved to Iowa over a dozen years ago. With regard to reason (b), that is addressed *supra* Point I.B.2. With regard to reason (c), that is not what the challenged statement asserts, and it is entirely irrelevant.

5.  *"Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?"* Am. Compl. ¶ 22(e).

This statement is another non-actionable question. *See Abbas*, 783 F.3d at 1338. Plaintiffs nonetheless allege that the statement is false because:

(a) Plaintiffs never conspired, colluded, combined, associated, plotted, schemed or agreed with Steve King to do anything; in fact, Anthony only met Steve King

15

briefly one time and the last time Tony spoke with Steve King was approximately a decade before Defendants' published the Article, so there could be no conspiracy; (b) Plaintiffs did not conspire with Devin Nunes to hide anything – Devin Nunes has never had any involvement in the operation of NuStar and has no knowledge whatsoever of NuStar's labor and employment practices; (c) Devin Nunes' family did not sell its farm in California and move to Iowa; and (d) the move to Iowa was not hidden from anybody – in fact, the move was publicly disclosed and announced.

Am. Compl. ¶ 22(e).  Reasons (c) and (d) are addressed *supra* Point I.B.2.

As for reasons (a) and (b):  Even if this sentence were not a question, it is both (i) not defamatory, and (ii) a protected opinion to report that the Nuneses "conspire[d]" with others "to hide the fact that the congressman's family sold its farm and moved to Iowa," for the reasons stated *supra* Point I.B.2.  The use of the term "conspired" in the context of this Article is classic rhetorical hyperbole, like use of the term "blackmail" in *Greenbelt v. Bressler*.  The context does not even permit the term's use in a criminal sense.  *Horsley*, 304 F.3d at 1133 ("conspired with others" nonactionable hyperbole; "a reasonable listener would not have taken the statement as a literal assertion that [the plaintiff] had actually conspired in the technical legal sense").

And again, the constituent facts that support the opinion are disclosed.  The Article reports that Anthony III and Anthony Jr. asked a *Dairy Star* reporter who was preparing an article in 2009 about the family's move from California to Iowa that their relationship with Devin Nunes not be disclosed.  Sitwala Decl., Exs. A, B.  The Article also reports that, while Lizza was conducting reporting for the Article, Anthony Jr. "called the newspaper and demanded that the editors take the nine-year-old story down."  Sitwala Decl., Exs. A, B.  And it reports that Anthony Jr. donated $250 to Congressman King's campaign in 2012, one election cycle after Devin Nunes appeared at a campaign rally for King in his Iowa district, in which there was no mention in the press release about the fact that Devin Nunes's family had moved to Iowa (despite including related biographical information that "Congressman Nunes' family has operated a

dairy farm in Tulare County, California for three generations"). Sitwala Decl., Exs. A, B.[10]

6.      *"As he walked to his truck, [Anthony Jr.] looked back and warned me: 'If I see you again, I'm gonna get upset.' Apparently Sibley's First Amendment training hadn't filtered down to all its residents."* Am. Compl. ¶ 22(f).

Plaintiffs allege that Anthony Jr. "never warned Lizza or threatened him in any way or did anything that merited the 'First Amendment training' that the Town of Sibley agreed to and received in the Harms case." Am. Compl. ¶ 22(f). But Plaintiffs do not dispute that Anthony Jr. said to Lizza "If I see you again, I'm gonna get upset"—despite the Court observing that "it should be easy enough for them to allege that fact" if it could be supported. Order at 12.

It is not defamatory to report that Anthony Jr. told Lizza that he'd "get upset" if he saw him again; the fact that he said this to Lizza does not impugn his reputation in any way. *See Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 770, 771 (E.D. Pa. 2016) (statement that plaintiff "had come up to the office and caused a great scene" not defamatory; "there is nothing defamatory about [the plaintiff] getting angry or emotional, . . . whatever the cause"). And while it is fair to characterize this utterance as a "warning," that characterization is still protected opinion: The underlying fact is disclosed (*i.e.*, what Anthony Jr. said), and whether that statement constituted a "warn[ing]" cannot be proven true or false by any objective measure. Similarly, whether Anthony Jr. "did anything that merited the 'First Amendment training," is obviously "an opinion which would be incapable of being proven true or false." *See* Order at 12.

Moreover, the reporting is substantially true: The Complaint does not dispute that

---

[10]      Moreover, one can engage in a "conspiracy" without knowing all participants. *See United States v. Johnson*, 719 F.3d 660, 666 (8th Cir. 2013). *I.e.*, where Congressman Nunes "was the public figure at the heart of" the "conspiracy," Sitwala Decl., Exs. A, B, it is not required that Plaintiffs knew Congressman King for it to be substantially true that Plaintiffs participated in the conspiracy, *United States v. Buckley*, 525 F.3d 629, 633 (8th Cir. 2008) (describing a hub-and-spoke arrangement as a set of individual conspiracies). Indeed, the arrangement of the "conspiracy"—with Congressman Nunes "at the heart of" it—further supports that Plaintiffs are involuntary limited purpose public figures, *see infra* Point II.

Anthony Jr. told Lizza that he was "taking [his] license plate down and reporting [Lizza] to the sheriff," and that he didn't "want to be bothered." Sitwala Decl., Ex. A, B. Given this undisputed reporting, the fact that Anthony Jr. added that he would "get upset" if he saw Lizza again would not change the effect of the Article on the minds of readers.

> 7.  *"Other dairy farmers in the area helped me understand why the Nunes family might be so secretive about the farm: Midwestern diaries [sic] tend to run on undocumented labor."* Am. Compl. ¶ 22(g).

Plaintiffs allege that this sentence is false because:

(a) Plaintiffs were not "secretive" in any way about NuStar and the continuing insinuation, built to a crescendo throughout the Article, that Plaintiffs were hiding something "politically explosive" or were engaged in deceptive business practices is false; (b) NuStar did not run on undocumented labor – all of its labor is meticulously documented; and (c) midwestern dairies, including NuStar, do not tend to run on undocumented labor.

As for reason (a), whether Plaintiffs were "secretive" is protected opinion for the reasons stated *supra* Point I.B.2. As for reason (b), this statement does not report that NuStar specifically runs on undocumented labor, which is not defamatory in any event. *See infra* Point I.B.11.

As for reason (c): In its Order, the Court observed that "this sentence arguably suffers from the defect that the sole fact alleged is not made specifically concerning plaintiffs and it is also not necessarily defamatory because it does not allege the farms do so knowingly," and "[i]n any event, plaintiffs' complaint does not allege facts which, if proven, would show that Midwestern dairies do not run on undocumented labor." Order at 12. That observation was correct on all counts. This statement about what "Midwestern dairies" "tend" to do is not "of and concerning" NuStar—just one of thousands of dairy farms in the Midwest—or its owners and operators, Anthony Jr. and Anthony III. *See Schuster*, 602 F.2d at 854, 854-55; *Reeder*, 759 F. Supp. 2d at 1082. Moreover, it is not defamatory to report that any farm unknowingly hires undocumented labor, *see infra* Point I.B.11, and the Amended Complaint pleads no facts

regarding the hiring practices of "Midwestern Dairies" generally.

> 8. *"'They are immigrants and Devin is a strong supporter of Mr. Trump, and Mr. Trump wants to shut down all of the immigration, and here is his family benefiting from immigrant labor', documented or not."* Compl. ¶ 22(h).

This statement is a quote from a reporter for a dairy industry publication whom Lizza interviewed for the Article. The reporter explains to Lizza why, in his view, Lizza's "encounter with Anthony Jr.," described seven paragraphs above, was "hostil[e]." Sitwala Decl., Exs. A, B. Plaintiffs allege that "[t]hese statements are false because Plaintiffs do not benefit from *undocumented* immigrant labor and Defendants falsely insinuate that Plaintiffs do." Am. Compl. ¶ 22(h) (emphasis added). But that is simply not what is reported in this statement: The reporter is quoted as saying Plaintiffs are "benefiting from immigrant labor,' *documented or not*." Sitwla Decl., Exs. A, B (emphasis added). And even if this statement could be read to say that NuStar "benefit[s] from undocumented immigrant labor," that is not defamatory, *see infra* Point I.B.11.

> 9. *"I had a particularly sensitive interview that afternoon with a source who I knew would be taking a risk by talking to me about immigration and labor at NuStar. When I arrived, we talked for a few minutes before the source's cell phone suddenly rang. The conversation seemed strained. 'Sí, aquí está,' the source said. I learned that on the other end of the phone was a man named Flavio, who worked at NuStar. Somehow Flavio knew exactly where I was and whom I was talking to. He warned my source to end the conversation. Not only was I being followed, but I was also being watched, and my sources were being contacted by NuStar."* Compl. ¶ 22(i).

Plaintiffs allege that this statement is false because:

(a) Plaintiffs did not surveil Lizza or instruct anyone to surveil Lizza at any time; (b) none of the Plaintiffs ever warned or threatened or intimidated any source of Lizza in any way, nor did they even know the identity of any of his "sources"; (c) Lizza was not being "watched" by anyone – he was the one doing the stalking (a fact corroborated by numerous witnesses)!; and (d) NuStar never contacted any of Lizza's sources, a fact that can be proven by NuStar's phone records and other evidence.

With regard to reasons (a) and (c): This does not state that Plaintiffs were "surveilling" Lizza, and to the extent it states that Plaintiffs were "watch[ing]" Lizza, that is substantially if not

literally true: The Article reports, and the Amended Complaint does not dispute, that members of the Nunes family followed Lizza as he conducted his reporting. Sitwala Decl., Exs. A, B. Plaintiffs do not dispute this, let alone plead facts making their allegation of falsity plausible.

With regard to reasons (b) and (d), the Article reports that Flavio "warned [Lizza's] source to end the conversation." As discussed *supra* Point I.B.6, whether an utterance constitutes a "warning" or not is, in this context, an opinion. Moreover, it is not defamatory to report that NuStar, aware of Lizza's reporting efforts, "contact[ed]" Lizza's sources and instructed a person, who may be an employee or associate of NuStar, to stop speaking with Lizza. That NuStar was discouraging such persons from speaking with the press would not "tend[] to injure the reputation of [NuStar] or to expose [NuStar] to public hatred, contempt, or ridicule or to injure [NuStar] in the maintenance of [its] business." *Johnson*, 542 N.W.2d at 510.

> 10. *"Devin Nunes was the public figure at the heart of this, and he had no financial interest in his parents' Iowa dairy operation. On the other hand, he and his parents seemed to have concealed basic facts about the family's move to Iowa."* Am. Compl. ¶ 22(j).

Plaintiff argues that these statements are false because:

> (a) Devin Nunes was not at the heart of anything, including any conspiracy with Plaintiffs to hide a "politically explosive secret"; and (b) neither Plaintiffs nor Devin Nunes ever concealed any facts about Plaintiffs' move to Iowa – the move was open, obvious and publicly announced, and the Defendants knew about the move prior to publication of the Article.

Am. Compl. ¶ 22(j). As for reason (a), statements about Congressman Nunes are not of and concerning any of Plaintiffs. As for reason (b), this is not defamatory and is a statement of opinion, for reasons addressed *supra* Point I.B.2.

> 11. *"There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs . . . asserting that the farm was aware of their status ... A second source, who claimed to be an undocumented immigrant, also claimed to*

> have worked at NuStar for several years, only recently leaving the dairy, which
> this source estimated employed about fifteen people" Am. Compl. ¶ 22(k).

As an initial matter, these statements are not "of and concerning" Anthony Jr. or Anthony III and concern only NuStar.[11]  In any event, Plaintiffs allege that these statements are false for eight reasons.  Each are addressed below.

Reasons (a), "members of Plaintiffs' family and others in the small Sibley farming community saw Lizza driving slowly around the neighborhood, and developed concerns about trespassing and invasion of privacy (multiple witnesses saw Lizza filming and photographing the Nuneses' business and residence), so they decided to get Lizza's license plate and report him to the local sheriff," and (b), "after they googled his name, however, and learned about the accusations of 'improper sexual conduct', they became alarmed":  These "reasons" have nothing to do with the accuracy of the challenged statement.  Perhaps they were intended to provide context for why Lizza was being followed—that is addressed below.

Reason (c), "Plaintiffs and their family members did not 'follow' Lizza because NuStar 'did indeed rely, at least in part, on undocumented labor' or because they wanted to intimidate him and get him to stop reporting a story":  Plaintiffs do not dispute that they "followed" Lizza.  *See supra* Point I.B.9.  The Article does not report that Plaintiffs were attempting to "intimidate [Lizza] and get him to stop reporting a story," and this statement does not suggest that.

Reasons (d), "the anonymous 'sources' of information, if there were any, were unknown to Lizza, completely unverified, and unreliable because they never sent any undocumented

---

[11]     *See Gilman v. Spitzer*, 538 F. App'x 45, 47 (2d Cir. 2013) ("[A] broad reference to an organization cannot give rise to a defamation claim by one of its constituent members."); *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (dismissing claims brought by company's investors where allegedly defamatory statement concerned company, not individual investors); *McBride v. Crowell-Collier Publ'g Co.*, 196 F.2d 187, 189 (5th Cir. 1952) ("If what is said in the article about the corporation, in which he is said to own stock, does, or could, constitute defamation of the corporation for which a libel action would lie, the action would be that of the corporation, not that of the owners of its stock.").

workers to NuStar," and (h) "Lizza did nothing to verify the accuracy of his unreliable anonymous sources, and he ignored the fact that there were never any reported cases of NuStar's use of undocumented labor": These are textbook "non-denial denials": Challenges to the credibility of the sources without challenging whether the reporting itself is true. In any event, it is not clear what bases Plaintiffs have to challenge the credibility of Lizza's sources, as Plaintiffs fail to plead facts that would support their conclusory allegation that any source was unreliable. Also, the Article is quite transparent that Lizza had multiple sources who stated northwestern Iowa dairy farms generally hire undocumented workers, and so it is not plausible to state that he "did nothing to verify the accuracy of" the sources who reported on NuStar's hiring practices.

Reasons (e), "NuStar did not hire undocumented labor as its business records will attest," and (f), "no undocumented immigrant worked at NuStar for 'several years' further undercutting the veracity and reliability of the anonymous 'second' source'": First, it is not defamatory to report that NuStar hired undocumented labor. That is not in itself unlawful, *see* 8 U.S.C. § 1324a (requiring *knowledge* of the worker's status as an illegal alien), and it does not lower Plaintiffs' reputation to report merely that they hired persons who are undocumented (which, in the context of this article, does not mean that the worker lacks any proof of citizenship at all, but rather that the worker lacks authentic proof of citizenship or legal status and, instead, presented the employer with fraudulent documents concerning citizenship or legal status).[12] *Cf. Staff Management v. Jimenez*, 839 N.W.2d 640, 651 (Iowa 2013) ("[A]n employment contract with an

---

[12]      *See* Sitwala Decl., Exs. A, B ("[I]t's an open secret that the system is built on easily obtained fraudulent documents. 'I just look at the document—Hey, this looks like a good driver's license, permanent resident card, whatever the case is—and that's what you go with,' the farmer said. A second northwest-Iowa dairy farmer who knows the Nunes family told me, 'They show you a Social Security card, we take out Social Security taxes. Where'd they get the card? I have no idea.'"); *see also id.* (describing a source who provided a nearby dairy farm "with a fake Social Security number").

undocumented worker does not inherently have an illegal purpose, and it is not void as illegal merely because the contract is with an undocumented worker.").

Moreover, the quote in the Amended Complaint conspicuously omits the following statement, which NuStar does not challenge as being false: "'I've been [to NuStar] and bring illegal people,' the source said." Sitwala Decl., Exs. A, B. In light of this unchallenged fact, there can be nothing substantially false about the challenged statement. *See also id.* (another unchallenged statement in the following paragraph: "A second source, who claimed to be an undocumented immigrant, also claimed to have worked at NuStar for several years, only recently leaving the dairy, which this source estimated employed about fifteen people."); *N.U. by Amar v. E. Islip Union Free Sch. Dist.*, No. 16-CV-4540 (SJF) (ARL), 2017 WL 10456860, at *19 (E.D.N.Y. Sept. 15, 2017); *Int'l Ass'n of United Mine Workers Union v. United Mine Workers of Am.*, No. 2:04CV00901, 2006 WL 1183245, at *19 (D. Utah May 1, 2006).

Reason (g), "NuStar was not 'aware of their status' and did not violate Federal law (Title 8 U.S.C. § 1324a) by knowingly hiring an unauthorized alien": Plaintiffs have misquoted the portions of the Article they challenge. In their Amended Complaint, Plaintiffs omit the underlined content below from the "statement" they are challenging:

> One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs. "I've been there and bring illegal people," the source said, asserting that the farm was aware of their status. "People come here and ask for work, so I send them over there."

Sitwala Decl., Exs. A, B. The Article does not report that NuStar knowingly hired undocumented workers. Rather, it reports that NuStar was aware of the "illegal" status of persons who were *brought* to the farm—but not that the farm then hired those persons with whom they were presented. Plaintiffs omit that key clause, misleadingly grafting that Plaintiffs

are "aware of their status" onto the (non-defamatory) statements concerning the hiring of

undocumented workers. Plaintiffs' omission of critical words is suspicious and unexplained,

even after Defendants' counsel addressed this very issue at the oral argument on their motion to

dismiss the Original Complaint. In any event, Plaintiffs cannot change the fact the Article does

not report that NuStar, in fact, *hired* persons with knowledge of their "illegal" status.

> 12.     *"I laid out the facts I had uncovered in Sibley, including the intimidation of sources."*  Am. Compl. ¶ 22(l).

Plaintiffs allege that "[t]his statement is false because Plaintiffs did not 'intimidate' any

of Lizza's sources."  This statement is not "of and concerning" Plaintiffs, as there are various

persons in Sibley who took steps to discourage persons from speaking with Lizza, according to

the Article.  But even assuming this is a reference to Flavio's direction to Lizza's source, it is

both not defamatory and a statement of opinion, for the reasons expressed *supra* Point I.B.9.

> 13.     *"I learned that Anthony Jr. was seemingly starting to panic. The next day, the 2009* Dairy Star *article about NuStar, the one that made me think the Nuneses were hiding something and that had led me to Sibley in the first place, was removed from the* Dairy Star*'s website. Anthony Jr., I was told, had called the newspaper and demanded that the editors take the nine-year-old story down. They relented … According to someone who talked to him that day, Anthony Jr. allegedly said that he was hiring a lawyer and that he was convinced that his dairy would soon be raided by ICE."* Am. Compl. ¶ 22(m).

Plaintiffs allege that these statements are false because:

> (a) Tony had no reason to panic and did nothing to indicate to anyone that he was panicked about anything; (b) Tony did not call the editors of the Daily Star; (c) Tony never made any demands or put any pressure on anyone to remove the story; (c) the editors did not "relent" to pressure from Tony; (d) Tony did not tell anyone he was hiring a lawyer and/or that he was convinced that NuStar would soon be raided by ICE.

Am. Compl. ¶ 22(m).  With regard to reason (a), whether Anthony Jr. had "start[ed] to panic" is

a subjective statement of opinion, not capable of being objectively proven true or false; the fact

that Anthony Jr. may disagree with the characterization that he "start[ed] to panic" does not

make it false, and indeed "the disagreement highlights the fact that these statements are expressions of opinion that are not subject to an action for defamation." *Mills*, 924 F. Supp. 2d at 1032. With regard to (b) and the first (c): The *Dairy Star* article at issue says nothing about NuStar's employment practices; it merely reports on Anthony Jr.'s and Anthony III's move from California to Iowa. *See* Sitwala Decl., Ex. E. Thus, the significance of Anthony Jr.'s reported actions with the *Dairy Star* was that he was trying to continue to keep the move to Iowa relatively "secret"—and, as discussed *supra* Point I.B.2, doing so is not defamatory. With regard to the second (c), that is not of and concerning Plaintiffs.

With regard to reason (d): As an initial matter, Plaintiffs have already admitted in this case that "Defendants' publication and republication of false factual statements have caused Plaintiffs to continuously suffer emotional distress, anxiety, fear of ICE raids and prosecution, . . . ." *See* Sitwala Decl., Ex. F, at 4.[13] It would therefore seem logical that Anthony Jr. would have informed others that he harbored that precise fear. In any event, it is not defamatory to report that Anthony Jr. said that he "was hiring a lawyer and that he was convinced that his dairy would soon be raided by ICE." Innocent people hire lawyers and fear investigations, and reporting this fact does not suggest that Plaintiffs did anything wrong.

14. *"Is it possible the Nuneses have nothing to be seriously concerned about? Of course, but I never got the chance to ask because Anthony Jr. [and Representative Nunes] did not respond to numerous requests for interviews."* Am. Compl. ¶ 22(n).

Plaintiffs allege that this statement is false because "[t]he rhetorical question insinuates

_____

[13] Plaintiffs' admission in their initial disclosures that they are afraid of "prosecution" for knowingly hiring illegal aliens draws into question the plausibility of Plaintiffs' allegations on this issue. While fear of an initial *raid* might be understandable if the Article reported that Plaintiffs knowingly hired undocumented workers, Plaintiffs—if innocent—would presumably have no rational fear of then being *prosecuted*, as no prosecutor would be likely to proceed with the case if they found no evidence to support the *mens rea* element of the offense.

that Plaintiffs have done something that they should be concerned about." Am. Compl. ¶ 22(n). Again, questions are not actionable as a matter of law, *see Abbas*, 783 F.3d at 1338, and in any event this "rhetorical question" is answered by acknowledging that, "of course," the Nuneses may indeed "have nothing to be seriously concerned about."

> 15.  An alleged defamatory implication: *"The strong defamatory gist and false implication from the Article is that Plaintiffs conspired with others (including Devin Nunes and Steve King) to hide and conceal a "politically explosive secret" – that NuStar knowingly employs undocumented labor on its dairy farm. The Article implies that Plaintiffs are dishonest, deceitful, unethical in their business practices, that they are hiding criminal conduct, and that they fail to document the immigrant labor that they use in NuStar's business."* Am. Compl. ¶ 23.

As explained in Defendants' brief supporting their pending motion to dismiss the amended complaint filed by Devin Nunes, to state a claim for defamation by implication, Plaintiff must plead both that (1) "a defamatory inference can reasonably be drawn" from the reported facts, *and* that (2) "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *See* Case No. 5:19-cv-04064-CJW-MAR, ECF No. 37, at 21-24 (describing the rule established by *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648-49 (8th Cir. 1985), *affirming summ. j. in full on reh'g en banc*, 788 F.2d 1300 (8th Cir. 1986), and *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (emphasis added) (the "*Janklow/White* rule"), and its progeny).

Plaintiffs have failed to state a claim for defamation by implication. Plaintiffs allege that there is a defamatory impression left by the following "juxtaposed false fact[s]": (1) "the direct reference in the opening sentence to a 'politically explosive secret'"; (2) "the 'conspiracy' to hide the secret"; (3) the rhetorical question, "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?"; and (4) Defendants' false statement "that NuStar knowingly uses of [sic]

'undocumented labor.'"  Am. Compl. ¶ 24; *see id.* ¶ 2.

However, there can be no defamation by implication where, as here, the plaintiff alleges that the underlying juxtaposed facts are false.  Under Iowa law, defamation by implication arises from the "careful choice of words in juxtaposition of statements" where the defendant has juxtaposed "statements that are true."  *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 828 (Iowa 2007) (citing Dan. B. Dodds, *Prosser & Keeton on the Law of Torts* § 116, at 117 (Supp. 1988)); *see also Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir. 1996) ("[T]he touchstone of implied defamation claims is an artificial juxtaposition of two *true* statements . . . ." (emphasis added) (applying Minnesota law) (citing Dodds, *supra*)). Plaintiffs cannot have it both ways.  They must choose:  They are either challenging the reporting as false, or they are arguing that the juxtaposition of true statements in the reporting gives rise to a false implication.  In the Amended Complaint, Plaintiffs clearly choose the former.

Even if Plaintiffs could construct a defamation-by-implication claim based on juxtaposed *false* facts, the Amended Complaint fails to do so. On the first prong:  Evaluating the Article in its entirety, the Article makes several explicit statements that refute the inference that Plaintiffs seek to draw.  *First*, the Article expressly states, "*So here's the secret*: The Nunes family dairy of political lore—the one where his brother and parents work—isn't in California.  It's in Iowa." Sitwala Decl., Exs. A, B (emphasis added).  This undermines the suggestion that the "secret" is what Plaintiffs suggest.  *See Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 148 (D.D.C. 2017) (no defamation by implication where the article "specifically includes facts that negate the implications that [the plaintiff] conjures up").  *Second*, any defamatory implication is undermined by the following disclaimer: "Is it possible the Nuneses have nothing to be seriously concerned about?  Of course . . . ."  Sitwala Decl., Exs. A, B.

*Third*, the Article inserts a horizontal line between Congressman Nunes's "secret" (addressed in the first 14 paragraphs) from what Lizza learns during his investigation (the balance of the Article). *Id.* And NuStar's hiring practices specifically are not addressed until 40 paragraphs later, in the Article's 54th paragraph. *Id.* Collectively, these signal to the reader that the "secret," described in the beginning of the Article, is separate from the farm's hiring practices described near the end of the Article, and thus the Article does not "link the key statements together." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 635 (Tex. 2018).

On the second prong: Plaintiffs make no attempt to allege there is anything in the Article suggesting that Defendants "intended" or "endorsed" the alleged implication. And for the reasons addressed above, no reasonable reading of the Article could support the conclusion that Defendants "intended" or "endorsed" the alleged implication.[14]

## II. Plaintiffs, Involuntary Limited Purpose Public Figures, Fail to Plausibly Allege that Defendants Made Any of the Challenged Statements with Actual Malice.

Separately and independently, Plaintiffs must plead fault to state a claim. The appropriate standard of fault in this case is actual malice, and the Amended Complaint does not even begin to meet the requirements for pleading actual malice under *Iqbal* and *Twombly*.

The Constitution requires that, to maintain a claim for defamation, public officials and public figures must plead (and prove) actual malice. The Supreme Court has identified three categories of public figures. The first category is all-purpose public figures. This includes persons who achieve such pervasive fame or notoriety that they become public figures for all

---

[14]    *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-94 (4th Cir. 1993) (granting motion to dismiss for failure to state a claim for defamation by implication under *Janklow/White* rule); *Deripaska*, 282 F. Supp. 3d at 148 (same); *Hogan v. Winder*, No. 2:12-CV-123 TS, 2012 WL 4356326, at *9 (D. Utah Sept. 24, 2012) (same); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 465 (S.D.N.Y. 2012) (same), *Abadian v. Lee*, 117 F. Supp. 2d 481, 488 (D. Md. 2000) (same); *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44 (2014) (same).

purposes. *Gertz*, 418 U.S. at 351. The second and most common category is voluntary limited purpose public figures. This includes persons who have thrust themselves into a particular public controversy, typically to influence the resolution of the issues involved. *Id.* at 345.

The third category is involuntary limited purpose public figures. This category includes persons who become limited purpose public figures through no purposeful action of their own, *id.*, but who have been "drawn into a particular public controversy," *id.* at 351. This category is narrow, but important: It provides for the breathing space necessary to report on public officials' and figures' involvement in matters of public concern where otherwise-private persons are inextricably part of the controversy. As explained below, Plaintiffs are involuntary public figures and thus subject to the actual malice pleading standard, which they have failed to meet.

### A. There Exists a Public Controversy Concerning Congressman Nunes's Relationship to His Family Farm.

As a matter of law, Plaintiffs here were "drawn into a particular public controversy." *Gertz*, 418 U.S. at 351. The Eighth Circuit has broadly defined the term "public controversy" to encompass questions of "public concern"—"or, in other words, those controversies raising issues that might reasonably be expected to have an impact beyond the parties directly enmeshed in the particular controversy." *In re IBP Confidential Bus. Documents Litig.*, 797 F.2d 632, 645 (8th Cir. 1986) (citation omitted). In this case, Plaintiffs were drawn into a public controversy concerning Congressman Nunes's relationship to his family's farm and his statements about his experience and connections with agriculture.

Congressman Nunes's family's farm has occupied a central role in his political and personal origin story. He touts that fact in his own lawsuit challenging the Article. Case No. 5:19-cv-04064-CJW-MAR, ECF No. 23 ("[f]rom childhood," he worked on his family's farm in Tulare County, California). The Article addresses this origin story directly: "Nunes grew up in a

family of dairy farmers in Tulare, California, and as long as he has been in politics, his family dairy has been central to his identity and a feature of every major political profile written about him."  Sitwala Decl., Ex. A, B.  The Article provides his constituents and those of Congressman King (and the public at large) information to help them determine what weight to afford Congressman Nunes's connections to his family dairy farm, and raises questions about whether he has been forthcoming about the fact that it moved to Iowa 14 years ago.  In doing so, the Article reported on, and greatly advanced the public's understanding of, a public controversy.

That the Article related to a matter of public concern and controversy is, in fact, admitted in the Amended Complaint, which alleges that Congressman Nunes's "voter bases" view the Congressman's close connection to the agricultural industry with favor, and that the Article's reporting concerning the location and hiring practices of the farm may "erode" that support. Specifically, Plaintiffs plead that "[t]he Defendants intentionally timed the original publication of the Article to occur within close proximity to the November 6, 2018 Congressional Election," and "it was the Defendants' intent to hurt Devin Nunes politically with false statements of fact and impair his voter bases (both agricultural and Republican) ahead of the Election."  Am. Compl. ¶ 14.[15]  The allegedly false statements in the Article were, according to the Amended Complaint, "specifically designed to erode support for Devin Nunes among California's agricultural community by misleading these voters into thinking that the family farm had moved."  Id.  And the Article's reporting that "NuStar employed undocumented labor" "was expressly intended to mislead conservative Republicans into believing that Devin Nunes was a 'hypocrite' and that he was soft on immigration."  Id.  Plaintiffs further plead that they were

---

[15]     Plaintiffs' subpoenas to Fusion GPS and an entity that provides funding to Fusion GPS—described in and attached to the motion to stay discovery that accompanies this Motion—further underscore that Plaintiffs believe this case is tied to at least one of the public controversies affecting Congressman Nunes and those he has included as part of his political life.

"collateral damage" in the Article's reporting on that matter of public concern. *Id.* ¶ 15; *see also id.* ¶ 3 ("The Defendants published click-bait, sensationalist and egregious misstatements not because there was an ounce of truth in the statements, but to dirty up Congressman Devin Nunes ahead of the 2018 Congressional Election set to take place on November 6, 2018.").[16]

In sum, Devin Nunes's relationship to his family's dairy farm is clearly a matter of public concern and controversy. *Cf. St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968) ("[T]he stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies.").

**B. Plaintiffs Are Involuntary Public Figures in Connection with the Public Controversy Concerning Congressman Nunes's Relationship to His Family's Farm.**

Although involuntary public figures are "exceedingly rare," *Gertz*, 418 U.S. at 345, and "[l]ittle guidance is provided in the category of involuntary public figures," *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 895 (Iowa 1989), courts have found that involuntary public figures tend to break into two camps. The first "group of individuals that might truly be considered involuntary public figures are relatives of famous people." *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1084 n.9 (3d Cir. 1985) (citing cases). For example, the children of Julius and Ethel Rosenberg were held to be involuntary public figures in connection

---

[16]    The Amended Complaint goes on to allege that, after the Article's September 2018 publication, Defendants tweeted a link to the Article "each time a major news story broke concerning Devin Nunes." *Id.* ¶ 16. For example, when Devin Nunes was in the news in March 2019 because the then-released "Mueller Report fully and completely vindicated the President of the United States and those who supported him, including Devin Nunes," *Esquire* tweeted a link to the Article. *Id.* ¶ 17. And in November 2019 when "Devin Nunes led the Republican criticism of House Democrats for their handling of the impeachment inquiry and other investigations into President Donald Trump," *id.* ¶ 18, Lizza tweeted a link to the Article, *id.* ¶ 19. These additional allegations further support that Congressman Nunes's relationship with his family's dairy farm is a public controversy, as the Article raised questions about the Congressman's fitness and candor that deserve consideration by his constituents and the public in the context of his discharge of his duties as a Congressman.

with a book about their parents' trial, merely by virtue of their having been the Rosenbergs's children, and even though they "renounced the public spotlight by changing their name to Meeropol." *See Meeropol v. Nizer*, 381 F. Supp. 29, 34 (S.D.N.Y. 1974), *aff'd*, 560 F.2d 1061 (2d Cir. 1977). Similarly, in *Brewer v. Memphis Publ'g Co.*, the Fifth Circuit held that an ex-girlfriend of Elvis Presley and her husband were public figures for purposes of an article regarding the ex-girlfriend visiting Presley in Las Vegas while married to her husband. 626 F.2d 1238, 1257-58 (5th Cir. 1980). With regard to the husband in particular, the court recognized that he had never had any involvement in his wife's relationship with Presley (and thus connection to that controversy at all), but still, "the same standard" of actual malice "must be applied to [the husband's] suit," as his role in the suit should not be allowed to "reduce the constitutional protection afforded the press to publish stories about" Presley's ex-girlfriend. *Id.*[17]

The second camp of involuntary public figure cases concern persons who are necessarily part of a story about public officials and public business. For example, in *Lewis v. NewsChannel 5 Network, L.P*, a local television news station reported that a major with a local police department (a public official) had inappropriately intervened to prevent his brother-in-law from being arrested. When the brother-in-law sued the station for defamation, the court in *Lewis* held that he was "an unfortunate victim of circumstance pulled into the whirlwind caused by a public official's allegedly improper conduct," and thus an involuntary public figure. 238 S.W.3d 270, 300 (Tenn. Ct. App. 2007). It was necessary to report on the brother-in-law's role in the affair to

---

[17]    *See also Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir. 1976) (wife of Johnny Carson held to be public figure for article regarding relationship with Carson: "[O]ne can assume that the wife of a public figure such as Carson more or less automatically becomes at least a part-time public figure herself."); *Zupnik v. Associated Press Inc.*, 31 F. Supp. 2d 70, 72 (D. Conn. 1998) (wife of physician subject to numerous regulatory, civil, criminal investigation had "become a public figure" in controversies concerning her husband's malfeasance "through no purposeful action of [her] own"; "[d]espite the fact that the plaintiff has not sought a public role, she has been thrust into the role of a public figure by virtue of her marriage to Dr. Zupnik.").

"remove[] ambiguity from the story." *Id.* at 299-300. The court explained:

> To fail to create the breathing space for necessary reporting on the misconduct of public officials on matters of public concern where a private person is integrally and meaningfully intertwined would be to miss the proverbial forest for the proverbial trees. The actual malice standard is rooted in the ability of the media and the citizens to discuss and debate improper actions of public officials with sufficient breathing space to be free from the chilling effect of civil litigation and damage awards arising from inevitable errors and mistakes.

*Id.*; *see also Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 742 (D.C. Cir. 1985) (air traffic controller on duty at time of plane crash drawn into public controversy and made involuntary public figure "[b]y sheer bad luck").[18]

What is striking in this case is that Plaintiffs fall into both camps. They are relatives of a nationally prominent, famous public official. The Article addresses the core of his political origin story, which is key to his political identity and credibility. That story cannot be explored without discussing Congressman Nunes's father, brother, and their farm.[19] Plaintiffs assert that they are "collateral damage" in the context of the Article about Congressman Nunes, Am. Compl. ¶ 14, which is to say they are "integrally and meaningfully intertwined" in the public controversy concerning the location of Congressman Nunes's family farm, *Lewis*, 238 S.W.3d at 299-300. To afford the necessary "breathing space" to report on this matter of public concern, Plaintiffs must be deemed involuntary public figures. *Id.* The fact that Plaintiffs play a role in the affair should not work to "reduce the constitutional protection afforded the press to publish

---

[18]    *Cf. Bay View Packing Co. v. Taff*, 543 N.W.2d 522, 533 (Wis. Ct. App. 1995) (company's "voluntary inaction" of not responding to public health risks posed by food it was processing "inevitably put them into the vortex of a public controversy" (citation omitted)); *Wiegel v. Capital Times Co.*, 426 N.W.2d 43, 45-46 (Wis. Ct. App. 1988) (in report about government's failure to confront soil conversation, farmer who was named as failing to follow best practices held to be an involuntary public figure because of his substantial acreage).

[19]    Toni Dian Nunes—Congressman Nunes's mother, who also serves as the treasurer for his campaigns—has not joined in this lawsuit as a plaintiff. Am. Compl. ¶ 5 (hyperlinks to FEC filings). Her notable exclusion from this case, perhaps as an attempt to avoid the actual malice standard, should not work to stifle debate and discussion regarding Congressman Nunes.

stories" that bear on Congressman Nunes's fitness for office. *Brewer*, 626 F.2d at 1257-58.

**C. Plaintiffs Fail to Plead Facts Sufficient to Make Their Allegation of Actual Malice "Plausible."[20]**

Plaintiffs fail to allege facts sufficient to make it plausible that Defendants acted with "actual malice," *i.e.*, knowledge of falsity or reckless disregard for the truth of the statements. A publisher acts with "reckless disregard" when it has a "high degree of awareness of . . . probable falsity." *Gertz*, 418 U.S. at 332 (citations omitted). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," but rather whether "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731. This establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue.

Importantly, the definition of "actual malice" in the *constitutional* sense is "unlike the common law definition of actual malice"; it "focuses upon the attitudes of defendants vis-à-vis the truth of their statements, as opposed to their attitudes towards plaintiffs." *Barreca v. Nickolas*, 683 N.W.2d 111, 120 (Iowa 2004). "[U]nder *New York Times*, a plaintiff cannot demonstrate actual malice 'merely through a showing of ill will or "malice" in the ordinary sense of the term.'" *Bertrand*, 846 N.W.2d at 899 (citations omitted).

Here, Plaintiffs fail to satisfy the *Twombly*/*Iqbal* standard of pleading sufficient factual matter to make their allegation of actual malice "plausible." Although the Amended Complaint is larded with conclusory allegations that Defendants had an agenda and harbored ill will and

---

[20] Plaintiffs make their allegations of "actual malice" in the context of pleading facts to support their demand for punitive damages. For the same reasons Plaintiffs have failed to plead actual malice as required to state a claim in the first place, their failure to plead actual malice with sufficient factual support is reason to dismiss Plaintiffs' demand for punitive damages. *Gertz*, 418 U.S. at 349; *Gauthier v. Waterloo Cmty. Sch. Dist.*, No. C05-2070, 2006 WL 463512, at *2 (N.D. Iowa Feb. 24, 2006) (dismissing claim for punitive damages).

animus toward Congressman Nunes, *see, e.g.*, Am. Compl. ¶ 44(a), (c), (e), (g), these sorts of allegations have no bearing on Defendants' attitude toward "the truth of their statements, as opposed to their attitudes towards plaintiffs." *Barreca*, 683 N.W.2d at 120.[21]  Similarly, it does not matter if Defendants relied on sources who were biased, another conclusory allegation. *See* Am. Compl. ¶ 44(c); *St. Amant*, 390 U.S. at 733 ("[f]ailure to investigate" not evidence of actual malice).

Plaintiffs' allegation that Defendants did not adhere to "standards of ethics" or "all journalistic standards in writing, editing and publishing," Am. Compl. ¶ 44(b), is conclusory and unsupported by any factual allegations.  It is also irrelevant; failure to adhere to such standards might relate to negligence, but not a knowing publication of falsity or a reckless disregard of the facts.  *St. Amant*, 390 U.S. at 730 (failures to obtain corroboration or to confirm veracity or reliability of source does not establish "reckless disregard for the accuracy of" the source's statements).  In sum:  Even if the Article contained any otherwise actionable defamatory statements (and it does not, for the reasons stated *supra* Point I), Plaintiffs have not pleaded that any of the allegedly defamatory statements were made with actual malice by Defendants.

### Conclusion

For the reasons stated above, in their related motion papers, and in the related motion to dismiss papers in the interlinked defamation case by Congressman Nunes, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice pursuant to Rule 12(b)(6), enter judgment in favor of Defendants, and assess all costs to Plaintiffs.

[*signature block on next page*]

---

[21]     For the same reason, the allegation that Defendants used "unnecessarily strong and violent language, disproportionate to the occasion" is (besides being demonstrably false from the face of the Article) irrelevant to the issue of actual malice, Am. Compl. ¶ 44(g)—and, assuming *arguendo* it is true, makes it clearer that many of the challenged statements are in fact opinions that cannot give rise to a defamation claim.

June 22, 2020

**Ryan Lizza and Hearst Magazine Media, Inc., Defendants**

By: /s/ Jonathan R. Donnellan

Jonathan R. Donnellan, *Lead Counsel*\*
 *jdonnellan@hearst.com*
Ravi V. Sitwala\*
 *rsitwala@hearst.com*
Nathaniel S. Boyer\*
 *nathaniel.boyer@hearst.com*
THE HEARST CORPORATION
Office of General Counsel
300 West 57th Street
New York, New York 10019
Telephone: (212) 841-7000
Facsimile: (212) 554-7000
*Admitted Pro Hac Vice*

Michael A. Giudicessi
 *michael.giudicessi@faegredrinker.com*
Nicholas A. Klinefeldt
 *nick.klinefeldt@faegredrinker.com*
Susan P. Elgin
 *susan.elgin@faegredrinker.com*
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

*Attorneys for Defendants*

**Certificate of Service**

The undersigned certifies that a true copy of **Defendants' Brief in Support of Their Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)** was served upon the following parties through the court's CM/ECF electronic filing system on June 22, 2020.

/s/  Jonathan R. Donnellan

Copy to:                                     Jonathan R. Donnellan

Joseph M. Feller
 *jfeller@kkfellerlaw.com*
Steven S. Biss
 *stevenbiss@earthlink.net*

*Attorneys for Plaintiff*