**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

ANTHONY NUNES, JR.; ANTHONY
NUNES, III; and NUSTAR FARMS,
LLC,

        Plaintiffs,

vs.

RYAN LIZZA; and HEARST
MAGAZINE MEDIA, INC.,

        Defendants.

No. 20-CV-4003-CJW-MAR

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.     BACKGROUND ................................................................................ 3

     A.    Factual Background................................................................ 3

     B.    Procedural Background .......................................................... 4

II.    APPLICABLE LAW ...................................................................... 5

     A.    Standard under FED. R. CIV. P. 12(b)(6) ..................................... 5

     B.    Substantive Law and Choice of Law............................................ 6

          1.    Defamation by False Statement.......................................... 6

          2.    Defamation by Implication .................................................10

III.   ANALYSIS......................................................................................11

     A.    Individual Statements............................................................11

B.     Defamation by Implication ....................................................28

     1.    Defamatory Inference ...................................................28

     2.    Subjective Intent .........................................................31

C.     Involuntary Public Figures and Actual Malice .............................32

     1.    Whether Plaintiffs are Involuntary Public Figures ..................33

     2.    Whether Plaintiffs Pled Actual Malice .............................36

D.     Federal Rule of Civil Procedure 12(f) ......................................40

IV.    CONCLUSION .............................................................................42

Case 5:20-cv-04003-CJW-MAR   Document 50   Filed 09/11/20   Page 2 of 42

This matter is before the Court on defendants' Pre-Answer Motion to Dismiss the Amended Complaint Pursuant to FED. R. CIV. P. 12(b)(6). (Doc. 33). Plaintiffs filed a timely resistance. (Doc. 41). Defendants timely replied to plaintiffs' resistance. (Doc. 43). On July 23, 2020, the Court held oral argument on defendants' motion to dismiss. (Doc. 46). The Court considers this matter fully submitted. For the following reasons, defendants' motion to dismiss is **granted in part** and **denied in part**.

## I.     BACKGROUND

### A.     *Factual Background*

Plaintiff NuStar Farms, LLC ("NuStar") operates a dairy farm in Sibley, Iowa. (Doc. 28, at 3). Plaintiffs Anthony Nunes, Jr. ("Anthony Jr.") and Anthony Nunes III ("Anthony III") (collectively "the Nuneses") manage NuStar. (*Id.*, at 4). Devin Nunes, a California congressman, is Anthony Jr.'s son and Anthony III's brother. (*Id.*, at 3).

The Nunes family has long owned and managed a dairy farm located in Tulare, California. (*Id.* at 4 n.1). This farm is closely associated with Devin Nunes's political profile. (*Id.*). In 2006, Anthony III, Anthony Jr., and Anthony Jr.'s wife Toni Dian ("Dian") moved to Iowa, formed NuStar, and started a new dairy farm. (*Id.*, at 3–4). Devin Nunes has never held any financial interest in NuStar and is not involved in its operations. (*Id.*).

On September 30, 2018, defendant Hearst Magazine Media, Inc. published in its *Esquire* magazine an article written by defendant Ryan Lizza ("Lizza") about plaintiffs and Devin Nunes ("the Article"). (*Id.*, at 7–8); *see also* (Doc. 33-2).[1] The Court will discuss the relevant portions of the Article in detail in its analysis of the claims, but a brief overview is useful here.

_____

[1] The Court will consider the Article as part of the record in ruling on defendants' motion to dismiss because it is necessarily embraced by plaintiffs' Amended Complaint. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (citation omitted).

The online version of the Article was headlined "Devin Nunes's Family Farm is Hiding a Politically Explosive Secret." (Doc. 33–2, at 2). The print version is entitled "Milking the System" and the text under the title, in part, asks "So why did [Devin Nunes's] parents and brother cover their tracks after quietly moving the farm to Iowa? Are they hiding something politically explosive?" (Doc. 33-3). In the seventh paragraph, the Article states "So here's the secret: The Nunes Family dairy of political lore—the one where [Devin Nunes's] brother and parents work—isn't in California. It's in Iowa." (*Id.*, at 5–6). The Article further explains the secret by discussing how Devin Nunes's family's move to Iowa was not publicized and was apparently obscured. *See, e.g.*, (*id.*, at 7). The Article goes on to discuss, among other things, the Nuneses' sale of their farm in California, the purchase of a farm in Iowa, the Nuneses' move to Iowa, and that Iowa dairy farmers, including NuStar, employ undocumented workers. (Doc. 33-2, at 4–6).

As part of his reporting, Lizza interviewed multiple sources about undocumented immigrant labor use on Iowa dairy farms generally and NuStar's use of undocumented labor specifically. *See, e.g.*, (*id.*, at 16). Lizza also spoke to Jerry Nelson ("Nelson"), a reporter for *Dairy Star* who previously wrote an article about the Nunes family's move to Iowa. (*Id.*, at 7). In the Article, Lizza also recounts his personal experience in Sibley investigating NuStar, including encounters with plaintiffs. *See, e.g.*, (*id.*, at 10).

**B.    *Procedural Background***

On January 16, 2020, plaintiffs filed a complaint in this Court alleging a single count of defamation. (Doc. 1). Paragraph 14 of the complaint alleged that the Article made false and defamatory statements about plaintiffs and listed 16 bullet points constituting the statements plaintiffs allege are false and defamatory. (*Id.*). On March 23, 2020, defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, a motion for a more definite statement under Rule 12(e). (Doc. 15). After further briefing by the parties, on April 24, 2020, the Court held a

4

hearing on the motion. (Doc. 26). On May 12, 2020, the Court entered an order that denied without prejudice defendants' Rule 12(b)(6) motion but granted defendants' Rule 12(e) motion. (Doc. 27).

On May 24, 2020, plaintiffs filed an amended complaint, again alleging a single count of defamation. (Doc. 28). Under a subheading "B. The False Statements and Why They Are False," plaintiffs list 14 statements that they allege are false and defamatory. (*Id.*, at 14–21). Plaintiffs also allege that the Article as a whole is defamatory by implication, alleging that "Defendant's carefully chose their words and purposefully misrepresented facts" and "juxtapose[d] a series of facts so as to imply a defamatory connection between them." (*Id.*, at 21–23). On June 22, 2020, defendants moved to dismiss the amended complaint. (Doc. 33).

## II. APPLICABLE LAW

### A. Standard under FED. R. CIV. P. 12(b)(6)

A complaint must contain "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought." FED. R. CIV. P. 8(a). Rule 12(b)(6) provides that a party may assert the defense of failure to state a claim upon which relief can be granted by motion "before pleading if a responsive pleading is allowed." "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," but "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Id.*, at 555–56. Indeed, a

5

theory asserted need only be plausible, which requires "enough fact to raise a reasonable expectation that discovery will reveal evidence of [the conduct alleged]." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has *alleged*—but has not *shown*—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added) (citation and internal quotation marks omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* When a pleading contains nothing more than conclusions, however, those conclusions are not entitled to the assumption of truth. *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "[T]here is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *Leimer v. State Mut. Life Assur. Co. of Worcester*, 108 F.2d 302, 306 (8th Cir. 1940).

### B. Substantive Law and Choice of Law

The Court has diversity jurisdiction over this case under Title 28, United States Code, Section 1332. *See* (Doc. 28, at 3–6). "A district court sitting in diversity applies the [substantive] law, including the choice-of-law rules, of the state in which it sits." *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). Here, both parties cite Iowa substantive law in their briefs and neither asserts a choice of law dispute. Consequently, the Court will apply Iowa substantive law.

### 1. Defamation by False Statement

Under Iowa law, defamation is either libel or slander. *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 83 (Iowa 2001). The Iowa Supreme Court defines libel as the "malicious publication, expressed either in printing or in writing, or by signs or

pictures, tending to injure the reputation of another person or to expose [that person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [a] business." *Plendl v. Beuttler*, 111 N.W.2d 669, 670–71 (Iowa 1961). Here, plaintiffs' complaint sounds in libel because it is based on an allegedly defamatory writing.

"Iowa courts recognize two types of libel: libel per se and libel per quod." *Doe v. Hagar*, 765 F.3d 855, 860 (8th Cir. 2014) (citation and internal quotation marks omitted). "A statement is libelous per se if it has 'a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.'" *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996) (quoting *Prewitt v. Wilson*, 103 N.W. 365, 367 (Iowa 1905)). "A statement is libelous per quod if it is necessary to refer to facts or circumstances beyond the words actually used to establish the defamation." *Id.* (citing 50 AM. JUR. 2D LIBEL AND SLANDER § 146 (1995)).

The elements of libel claims also differ depending on whether the plaintiff is a private or public figure and whether the defendant is a member of the media. Here, plaintiffs are private individuals. Under Iowa law, for a private plaintiff to plead a prima facie defamation action against a media defendant like the defendants here, plaintiffs would need to allege "(1) publication (2) of a false defamatory statement (3) concerning the plaintiff (4) in negligent breach of the professional standard of care (5) that resulted in demonstrable injury." *Johnson*, 542 N.W.2d at 510–11, n.3; *see also Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986) (holding that the First Amendment right to free speech mandates that a plaintiff "must show the falsity of the statements at issue in order to prevail in a suit for defamation."). "[I]f the incident involves a matter of public concern, the plaintiff must [also] prove actual malice to recover punitive damages." *Id.* at 511. When, as here, defendants are members of the media, there is no presumption that the libelous statements are false or caused injury. In other words, libel

per se is not available against members of the media. *See Bierman v. Weier*, 826 N.W.2d 436, 448 (Iowa 2013) (stating that "libel per se is available only when a private figure plaintiff sues a nonmedia defendant for certain kinds of defamatory statements that do not concern a matter of public importance.").

Only statements "of and concerning" plaintiffs can support a defamation claim. *Venckus v. City of Iowa City*, 930 N.W.2d 792, 809 (Iowa 2019). Courts may decide, as a matter of law, whether a statement is capable of being "of and concerning" the plaintiff. *See Reeder v. Carroll*, 759 F. Supp. 2d 1064, 1083 (N.D. Iowa 2010).

To show a statement is false, a plaintiff need not prove the literal falsity of every detail of a statement; rather, a plaintiff must prove that the "gist" or "sting" of the challenged statements are substantially false. *Hagar*, 765 F.3d at 863. "The gist or sting of a defamatory charge is the heart of the matter in question—the hurtfulness of the utterance." *Id.* (citation and internal quotation marks omitted). The Supreme Court has rejected "a wholesale defamation exemption for anything that might be labeled 'opinion,'" stating it was not persuaded that "an additional separate constitutional privilege for 'opinion' is required" under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 21 (1990) (citation omitted). Nevertheless, the essence of a defamation claim remains the existence of a false statement of fact. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 283 (1974). Thus, statements "that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 771 (Iowa 2006). Whether a statement implies a provably false factual assertion is an issue of law for the court to decide. *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989),

8

*overruled on other grounds by Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 224 (1998).

The Iowa Supreme Court adopted the following four-factor test to assess whether a statement is false:

> The first factor is whether the alleged defamatory statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. The second factor is the degree to which the alleged defamatory statements are objectively capable of proof or disproof. The third factor is the context in which the alleged defamatory statement occurs. The final factor we consider is the broader social context into which the alleged defamatory statement fits.

*Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018) (alterations, citations, and internal quotation marks omitted). In construing the context of the statement, Iowa courts consider whether the author disclosed the factual basis for the statement and whether the statement implies the existence of other, undisclosed defamatory facts. *See Yates*, 721 N.W.2d at 771 ("[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false.") (quoting *Moldea v. N.Y. Times Co.,* 22 F.3d 310, 313 (D.C. Cir. 1994)). In short, Iowa courts consider the language of the challenged statement in the context of the entire communication to determine if it implies a statement of fact. *See id.* at 770. If a statement does not imply the existence of a provable fact, then the statement is not actionable. *Bandstra*, 913 N.W.2d at 47.

To show that a statement is defamatory, plaintiffs must show that "it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Accent Media, Inc. v. Young*, 12-CV-07-LRR, 2013 WL 12140468, at *9 (N.D. Iowa Sept. 11, 2013) (quoting RESTATEMENT (SECOND) OF TORTS, § 559 (1977)). A court can determine as a matter

9

of law whether a challenged statement is capable of a defamatory meaning. *See Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 830 (Iowa 2007). Courts examine the entire communication and the totality of the circumstances to determine whether a reasonable reader could understand the statement as having the purported defamatory meaning. *Yates*, 721 N.W.2d at 772 (citation omitted).

To recap, plaintiffs must plausibly plead the Article contained false and defamatory statements concerning them and that, under the circumstances, defendants' statements implied provably false assertions of fact rather than defendants' opinions. The Court can determine each of these issues as a matter of law at this stage.

### 2. *Defamation by Implication*

Plaintiffs also allege defamation by implication which, under Iowa law, arises not from what is stated, but from what is implied when a defendant

> (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.

*Stevens*, 728 N.W.2d at 827 (alteration in original) (quoting Dan B. Dobbs, PROSSER & KEETON ON THE LAW OF TORTS § 116, at 117 (Supp. 1988)). Under the first form of defamation by implication, a plaintiff must show that a defendant juxtaposed true facts in a defamatory manner. *Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir. 1996) (stating "the touchstone of implied defamation claims is an artificial juxtaposition of two true statements" to create a defamatory result); *see also Stevens*, 728 N.W.2d at 828 (adopting the principle of defamation by implication). "Under this definition, a defendant does not avoid liability by simply establishing the truth of the individual statement(s); rather, the defendant must also defend the juxtaposition of two statements[.]" *Toney*, 85 F.3d at 387. A court may determine as a matter of law whether a reasonable person could conclude the statements at issue can

10

bear the allegedly defamatory implication. *See Bertrand v. Mullin*, 846 N.W.2d 884, 896 n.3 (Iowa 2014) (upholding district court's grant of judgment notwithstanding the verdict on a defamation by implication claim when no reasonable juror could understand the statements to give rise to the implication alleged by the plaintiff).

## III.   ANALYSIS

Defendants argue that the Court should dismiss plaintiffs' amended complaint because none of the challenged statements individually, or by implication, are defamatory. Defendants also argue that plaintiffs are "involuntary public figures" and thus plaintiffs' amended complaint is defective because it fails to plead facts showing actual malice. The Court will address each of these arguments in turn.

### A.   Individual Statements

As noted, plaintiffs' amended complaint identifies 14 allegedly defamatory statements. (Doc. 28, at 14–21). Defendants argue that none of the identified statements are defamatory for various reasons. Defendants address the statements individually (Doc. 37, at 15–35), but plaintiffs' brief largely ignores the individual statements and instead focuses on the implication of the Article as a whole (Doc. 41, at 12–22). In this section, the Court will address the individual statements or groups of statements in the order presented in the amended complaint. In the following section, the Court will address plaintiffs' arguments about the alleged implications of the Article.

### 1.   Devin Nunes's Family Is Hiding a Politically Explosive Secret. (Doc. 28, at 14)

Plaintiffs allege the Article's online headline and print sub-headline as the first false and defamatory statement. (Doc. 28, at 14). Plaintiffs argue this is a false statement because (1) NuStar is not Devin Nunes's family farm; (2) no one in the Nunes family is hiding anything about the farms at issue from anyone; (3) there was no hidden secret because the Nunes family dairy farm is still in California, not Iowa; and (4) "there was

11

no 'politically explosive' secret, as NuStar does not employ undocumented labor." (*Id.*) (emphasis removed).

This headline is not actionable for several reasons. First, the statement is not defamatory. Statements to the effect plaintiffs have a secret is not itself defamatory, even a politically explosive one. *See Wyo. Corp. Servs. v. CNBC, LLC*, 32 F. Supp. 3d 1177, 1187 (D. Wyo. 2014) (finding statements that the plaintiff created shell corporations "to conceal ownership" were not defamatory); *Cannon v. Bee News Pub. Co.*, 8 F. Supp. 154, 156–57 (D. Neb. 1933) (finding statement that the plaintiff was married in a "secret wedding" was not defamatory because the plaintiff "had a right, if [he] saw fit, to withhold the knowledge" of the wedding).

Further, defendants argue that the politically explosive secret refers to the family purportedly selling their farm in California, buying a farm in Iowa, and moving to Iowa. This is allegedly politically explosive because Devin Nunes's political identity is based in part on his roots to his family farm in his home district in California. There is nothing defamatory about a family keeping secret the sale of a family farm in one state and moving to another state. Plaintiffs assert the headline refers to a secret that NuStar employs undocumented workers. That is not what the headline says, and for reasons the Court will explain in the implied defamation discussion, not how a reasonable reader could interpret the headline and the Article when read as a whole and considered in context.

The statement also does not assert provably false facts, nor does it imply the existence of undisclosed facts. The statement that plaintiffs' farm is hiding a secret does not have a "precise core meaning for which a consensus of understanding exists." *See Bandstra*, 913 N.W.2d at 47. Plaintiffs argue they openly told family, friends, and colleagues they were moving to Iowa. On the other hand, the Article asserts that Devin Nunes did not publicize his family's move to Iowa. Regardless, there is no precise meaning for how many people can know a fact for it to remain a "secret," nor is there

12

an accepted line between "hiding" or "concealing" a fact and simply declining to publicize it. The challenged statement is simply not "objectively capable of proof or disproof[.]" *Id.* at 47 (alteration in original) (quoting *Yates*, 721 N.W.2d at 770).

The context of defendants' statement also weighs in favor of it being a protected opinion. Courts must also consider the "social context" of publications, which includes the style of writing and the intended audience. *Yates*, 721 N.W.2d at 770. Lizza wrote the Article in a first-person perspective and included numerous instances of his own subjective mental impressions. This weighs against any person reasonably construing the statement as one of fact as opposed to Lizza's characterization or opinion.

Finally, the statement cannot be construed as implying undisclosed defamatory facts because Lizza disclosed the basis for his conclusions. The Article states that Lizza was unable to find any mention from Devin Nunes or the press in Devin Nunes's district mentioning his family's move. (Doc. 33-2, at 6). The Article also mentions a *Wall Street Journal* editorial which discussed Devin Nunes's family's dairy farm and featured a Tulare, California dateline. (*Id.*, at 5). Nothing in the context of the Article otherwise implies that defendants' characterization is based on any other undisclosed facts. The Article also notes that Devin Nunes appeared at a town hall meeting with Iowa Congressman Steve King in Le Mars, Iowa, a town about fifty miles from Sibley. (*Id.*, at 7). The Article notes that the press release for that event did not mention Devin Nunes's family's ties to the district, but instead stated that Devin Nunes's "family has operated a dairy farm in Tulare County, California for three generations." (*Id.*). Second, the Article discusses how the *Dairy Star* article about NuStar mentioned several members of the Nunes family, but omitted Devin Nunes. (*Id.*). Nelson told Lizza this omission was at the Nuneses' request. (*Id.*). These facts show the basis for defendants' conclusion that Devin Nunes and others "conspired" to hide the family's move, but do not imply the

13

existence of other facts.  Readers are free to accept or reject opinions based on their own independent evaluation of the facts.

Thus, as a matter of law, the Court finds these statements are not defamatory.

> **2.** *So why did [Devin Nunes's] parents and brother cover their tracks after quietly moving the farm to Iowa?  Are they hiding something politically explosive?  On the ground in Iowa, Esquire searched for the truth—and discovered a lot of paranoia and hypocrisy.  (Doc. 28, at 14).*

Plaintiffs allege these statements are false for a variety of reasons: (1) "[p]laintiffs did not 'cover their tracks' and, in any case, there was nothing to 'cover' or hide;" (2) plaintiffs' move to Iowa was a publicized event, not concealed; (3) plaintiffs did not move their farming operation to Iowa but instead bought an existing dairy business in Iowa in 2006; (4) defendants did not come to Iowa to uncover the truth behind some secret, but rather to manufacture evidence to support a preconceived political story; (5) "none of Plaintiffs' business practices or beliefs reflected any 'hypocrisy' and Defendants did not discover any such 'hypocrisy';" and (6) plaintiffs and the Nunes family had nothing to hide and they were not paranoid or mentally ill—they and their neighbors were instead rightfully concerned by Lizza's bizarre behavior in their community.  (Doc. 28, at 14–15).

These statements are protected opinion for the same reasons stated in the prior section.  The fact that the first two sentences are in the form of questions does not change the analysis.  Questions, like opinions, can be defamatory when they imply the existence of defamatory facts.  *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015).  These questions, however, do not imply facts; they reflect the author's opinion and characterization.  The last statement also asserts defendants' opinion of what the author was doing "on the ground" in Iowa and his characterization of what he believes he encountered when there.  This statement is "rhetorical hyperbole" and is thus protected

14

by the First Amendment. *See Bertrand*, 846 N.W.2d at 899. In short, these statements also have no "precise core of meaning for which a consensus of understanding exists" and thus are not objectively capable of proof or disproof. *Bandstra*, 913 N.W.2d at 47 (citation omitted).

To the extent plaintiffs assert defendants did not search for the truth, they assert no facts in their amended complaint to show otherwise; rather, they make a conclusory assertion that defendants "took a preconceived storyline from political operatives and consciously set out to manufacture evidence to conform to the preconceived story." (Doc. 28, at 14). The same is true of plaintiffs' conclusory assertions that their conduct did not reflect hypocrisy and that they and their neighbors were justified in feeling concerned about Lizza's behavior. These reflect nothing but plaintiffs' own opinions and characterizations, to which they are entitled, but they do not reflect provable facts. Plaintiffs did not allege provable facts in their amended complaint that would show that the statements plaintiffs allege are provably false are indeed false. To the contrary, plaintiffs match the opinion and hyperbole of the challenged statements with their own opinion and hyperbole.

Thus, as a matter of law, the Court finds these statements are not defamatory.

> **3.** **So here's the secret: The Nunes family dairy of political lore—the one where [Devin Nunes's] brother and parents work—isn't in California. It's in Iowa. Devin; his brother, Anthony III; and his parents, Anthony Jr. and Toni Dian, sold their California farmland in 2006. Anthony Jr. and Toni Dian, who has also been the treasurer of every one of Devin's campaigns since 2001, used their cash from the sale to buy a dairy eighteen hundred miles away in Sibley, a small town in northwest Iowa where they—as well as Anthony III, Devin's only sibling, and his wife, Lori—have lived since 2007. . . . [W]hat is strange is that the family has apparently tried to conceal the move from the public—for more than a decade. (Doc. 28, at 15).**

Plaintiffs allege these statements are false because (1) the Nunes family dairy farm is and always has been in California, there is no secret; (2) the Nunes family dairy was never sold; (3) Anthony III, Anthony Jr., and Dian do not work at the Nunes family dairy; (4) Devin Nunes never owned any California farmland with his parents; (5) Anthony Jr. and Dian bought an existing dairy in Iowa; and (6) neither Anthony III, Anthony Jr., nor Dian ever attempted to conceal their move to Iowa. (Doc. 28, at 15).

These statements do not constitute actionable defamation. Like the other statements about whether plaintiffs hid or concealed their move to Iowa, these statements reflect the author's opinion about and characterization of the move, based on sources and facts the author identifies in the Article. As such, they are protected opinion and not actionable defamation.

Plaintiffs do quibble with factual details—whether Anthony III, Anthony Jr., and Dian work at the Nunes' family dairy, whether Devin Nunes actually owned any California farmland, and who exactly bought the Iowa dairy. Defamation is not defined by minor inaccuracies, instead the "gist" or "sting" of the statement must be defamatory. *Hagar*, 765 F.3d at 863. Even if these facts are provably false, there is nothing defamatory about these facts or the gist of them. Who owned or worked at or bought farmland are not the type of statements "tending to injure the reputation of another person or to expose [that person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [a] business." *See Plendl*, 111 N.W.2d at 670–71.

Thus, as a matter of law, the Court finds these statements are not defamatory.

### 4. *Devin Nunes's "immediate family's farm—as well as his family—is long gone." (Doc. 28, at 15).*

Plaintiffs allege these statements are false because (1) many members of Devin Nunes's family still reside in California, including his wife, children, grandmother, and extended family; (2) Anthony Jr., Dian, and Anthony III did not move any farm from

California to Iowa; and (3) Anthony Jr., Dian, and Anthony III "retain significant farming interests in California." (Doc. 28, at 15–16).

For the same reasons the prior statements are not defamatory, these, too, are not defamatory. Reasonable people can quibble about whether Devin Nunes's parents and brother constitute his "immediate family" and whether the fact that some of them "retain significant farming interests in California" (whatever that means) is the same as having a farm in California. Regardless, none of these alleged facts are defamatory in nature. The Nuneses may farm in California, or not, and live in California, or not, and either way it does not tend to injure their reputation, or expose them to public hatred, contempt, or ridicule, or injure their business.

Thus, as a matter of law, the Court finds these statements are not defamatory.

### 5. Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa? (Doc. 28, at 16)

Plaintiffs allege these statements are false because (1) plaintiffs never conspired in any way with Steve King to do anything—they have only interacted with Steve King briefly on a few occasions in the distant past; (2) plaintiffs did not conspire with Devin Nunes to hide anything—Devin Nunes has no involvement in NuStar or its operation; (3) Devin Nunes's family did not sell its farm in California and move to Iowa; and (4) the move to Iowa was publicized and not hidden. (Doc. 28, at 16).

First, the assertion that plaintiffs conspired with others to do anything is a conclusion or characterization based on facts but is not a fact itself. *See Kotlikoff v. Cmty. News*, 444 A.2d 1086, 1091 (N.J. 1982) (holding that a letter to the editor of local newspaper criticizing a mayor's official conduct, suggesting that the mayor and taxpayers might be "engaged in huge coverup," and published under heading "A Conspiracy?" was an opinion based on disclosed facts, concluding that defamation action premised on

17

expressed opinion fails "no matter how unjustified, unreasonable or derogatory the opinion might be"). Thus, the Article's implied assertion that plaintiffs and others conspired to hide the move to Iowa is not capable of being proven true or false and thus cannot be actionable defamation.

Regardless, defendants' statement that plaintiffs "conspired" with others to hide Devin Nunes's family's move is not actionable because it is also not defamatory in nature. "Conspire" can include criminal conspiracy, but it has a broader definition meaning "to act in harmony toward a common end." *Conspire*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary. The Article asks why plaintiff and others would "conspire to hide the fact that [plaintiff]'s family sold its farm and moved to Iowa?" (Doc. 33-2, at 7). The Court must determine as a matter of law whether a reasonable reader could interpret the statement as defamatory. *See Yates*, 721 N.W.2d at 771–72. The object of the "conspiracy" at issue was hiding Devin Nunes's family's move to Iowa. Moving or concealing a move is not a crime. Because the object of the "conspiracy" is harmless, no reasonable reader could interpret the term "conspiracy" to imply criminal conduct in this context. As such, the statement is not defamatory as a matter of law because it does not tend to injure plaintiffs' reputation, expose them to public hatred, contempt, or ridicule, or injure the maintenance of their business. To the extent that plaintiffs allege the statements that they sold a farm in California are false, as noted previously, there is nothing defamatory in nature about the sale of a farm.

Thus, as a matter of law, the Court finds these statements are not defamatory.

> **6.** ***As he walked to his truck, [Anthony Jr.] looked back and warned me: "If I see you again, I'm gonna get upset." Apparently Sibley's First Amendment training hadn't filtered down to all its residents. (Doc. 28, at 16)***

Plaintiffs allege these statements are false because Anthony Jr. never warned Lizza or threatened him in any way or did anything that merited the 'First Amendment training' that the Town of Sibley agreed to and received in the Harms case." (Doc. 28, at 16–17).

Plaintiffs' amended complaint does not deny that Anthony Jr. made the alleged statements; rather, it asserts that the characterization of those statements as a warning or a threat is false. Calling the statement a "warning" is a characterization that is not an assertion of fact and is protected speech. So, too, is Lizza's observation and opinion that First Amendment training had not "filtered down" to all of Sibley's residents. This is particularly true in the literary context of the Article written from Lizza's first-person perspective and his use of the word "apparently," making clear that it was his subjective interpretation of the situation.

Even if plaintiffs' amended complaint could be interpreted as asserting that the statement is false because Anthony Jr. never said those words, it would still not constitute defamation. There is nothing defamatory about asserting that a person made the statement: "If I see you again, I'm gonna get upset." There is nothing about that statement that, if attributable to a person, would injure the person's reputation, expose the person to public hatred, contempt, or ridicule, or injure the person's business. Indeed, the statement itself suggests a degree of self-control and restraint by the speaker. It does not paint the speaker as being irrational, unstable, or otherwise inappropriate. Nor does it attribute any misconduct or threatened misconduct to the speaker.

Thus, as a matter of law, the Court finds these statements are not defamatory.

19

> **7.** ***Other dairy farmers in the area helped me understand why the Nunes family might be so secretive about the farm: Midwestern dairies tend to run on undocumented labor. (Doc. 28, at 17).***

Plaintiffs allege these statements are false because (1) NuStar was in no way a secret business operation and it was not hiding any deceptive business practices; (2) "NuStar did not run on undocumented labor;" and (3) "midwestern dairies, including NuStar, do not tend to run on undocumented labor." (Doc. 28, at 17).

The Court has previously addressed the portion of the statement involving the Nuneses allegedly being secret about the farm; that is an opinion not subject to proof as true or false and is not, therefore, an actionable claim of defamation. To the extent the statement alleges that other midwestern dairies tend to operate on undocumented labor, it is not a statement of and concerning plaintiffs and thus cannot serve as a basis for plaintiffs to claim defamation. In context, however, a person could reasonably read the statement as implying that NuStar also "tends to run on undocumented labor." *See Ruzicka v. Conde Nast Publ'ns, Inc.*, 999 F.2d 1319, 1322 n.6 (8th Cir. 1993) ("The plaintiff need not be cited by name for the defamation to be 'of and concerning the plaintiff.'") (citation omitted). The question, then, is whether that allegation, if false, is defamatory in nature.

The statement does not explicitly state that plaintiffs knowingly employ undocumented labor. The unwitting employment of undocumented workers is not defamatory. It does not explicitly allege plaintiffs engage in illegal conduct or engaged in shoddy employment practices. Thousands of businesses across the United States employ undocumented workers who use sophisticated false documentation that the employers are unable to detect despite their best efforts. That an employer happens to have such employees on its payroll is not defamatory.

Thus, as a matter of law, the Court finds these statements are not defamatory.

20

> 8. *"They are immigrants and Devin is a strong supporter of Mr. Trump, and Mr. Trump wants to shut down all of the immigration, and here is his family benefiting from immigrant labor," documented or not. (Doc. 28, at 17).*

Plaintiffs allege this statement is "false because Plaintiffs do not benefit from undocumented labor and Defendants falsely insinuate that Plaintiffs do." (Doc. 28, at 17).

To be clear, this language is a quote from Nelson, the reporter for *Dairy Star* whom Lizza interviewed; Lizza added the "documented or not" words to the end of the quote. Plaintiffs do not contest that Nelson made this statement to Lizza.

This statement is not actionable for several reasons. The statement that the Nunes family benefits from immigrant labor is not in itself defamatory. This statement does not allege plaintiffs are employing undocumented immigrant workers. There is nothing defamatory about employing documented immigrant labor. Again, even if a reader interpreted the statement as implying that plaintiffs might employ undocumented labor, the statement does not explicitly allege that plaintiffs do so knowingly. The unwitting employment of undocumented workers is not defamatory. Thus, the statements do not allege plaintiffs engaged in illegal conduct or shoddy employment practices.

Thus, as a matter of law, the Court finds these statements are not defamatory.

> 9. *I had a particularly sensitive interview that afternoon with a source who I knew would be taking a risk by talking to me about immigration and labor at NuStar. When I arrived, we talked for a few minutes before the source's cell phone suddenly rang. The conversation seemed strained. "Sí, aquí está," the source said. I learned that on the other end of the phone was a man named Flavio, who worked at NuStar. Somehow Flavio knew exactly where I was and whom I was talking to. He warned my source to end the conversation. Not only was I being followed, but I was also being watched, and my sources were being contacted by NuStar. (Doc. 28, at 17–18).*

These statements assert the following facts: (1) the author interviewed a source in the afternoon; (2) the source's cell phone rang during the interview; (3) the source said "Sí, aquí está."; (4) the caller was a man named Flavio; (5) Flavio worked at NuStar; and (6) Flavio warned the source to end the conversation. Plaintiffs allege that the statements are false because plaintiffs did not surveil Lizza or instruct anyone else to do so, plaintiffs did not warn the source, Lizza was not being watched,[2] and NuStar never contacted Lizza's sources. (Doc. 28, at 18). Plaintiffs concede that they have no basis to prove that Lizza's source did not exist. (*Id.*, at n.5).

These statements do not constitute defamation. The assertion that plaintiffs were surveilling, watching, or following Lizza are substantially true, as plaintiffs concede in their complaint that they "saw Lizza driving slowly around the neighborhood, and developed concerns about trespassing and invasion of privacy," "decided to get Lizza's license plate and reported him to the local sheriff," and "googled his name." (Doc. 28, at 19). Plaintiffs do not deny following Lizza; they just deny following him for the reason Lizza suspected. (*Id.*) (denying plaintiffs followed Lizza because of a concern about undocumented labor or in an attempt to intimidate Lizza). Even if plaintiffs never contacted Lizza's source, the claim that they did is not defamatory. There is nothing illegal, improper, embarrassing, or defaming about an employer contacting an employee who is speaking to a reporter. Indeed, even if the statements that plaintiffs surveilled, watched, or followed Lizza are false, they are not defamatory. Again, there is nothing about such allegations that would injure plaintiffs' reputations, expose them to public hatred, contempt, or ridicule, or injure their business.

---

[2] In their complaint, plaintiffs take this opportunity to malign Lizza by making spurious allegations against him that have nothing to do with the merits of their defamation claim against defendants. (Doc. 28, at 18 n.6). Plaintiffs repeat the allegation on the following page. (*Id.*, at 19). Including wholly unrelated allegations against one of the defendants in a publicly filed complaint is unprofessional and reflects poorly upon the ethics and integrity of plaintiffs' counsel.

Thus, as a matter of law, the Court finds these statements are not defamatory.

**10.    *Devin Nunes was the public figure at the heart of this, and he had no financial interest in his parents' dairy operation. On the other hand, he and his parents seemed to have concealed the basic facts about the family's move to Iowa. (Doc. 28, at 18).***

Plaintiffs allege these statements are false because (1) Devin Nunes was not involved in any conspiracy to conceal his family's move and (2) the Nuneses' move to Iowa was publicized, well-known, and not a secret.  (Doc. 28, at 18–19).

These are not defamatory statements.  Plaintiffs do not take issue with the first sentence asserting that Devin Nunes had no financial interest in his parents' dairy operation; rather, they take issue with the phrase that Devin Nunes was at the "heart" of something.  To the extent the statement is about Devin Nunes, it is not of and concerning plaintiffs.  To the extent it asserts Devin Nunes was at the heart of something, that is a characterization and opinion that does not imply a fact that can be proven false.  The second sentence is not actionable for the oft repeated reason that whether plaintiffs concealed their move to Iowa is an opinion.  Further, alleging plaintiffs concealed their move to Iowa does not defame them.  Alleging they hid their move to Iowa does not injure plaintiffs' reputations, expose them to public hatred, contempt, or ridicule, or injure their business.  The statement also does not allege that plaintiffs hid the move completely; rather, it asserts that plaintiffs hid facts about the move.  The basis for this assertion finds support in plaintiffs' request of Nelson not to mention they were related to Devin Nunes, and the omission of their farm's mention in Steve King's press release.

Thus, as a matter of law, the Court finds these statements are not defamatory.

23

> ***11.*** *There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs . . . asserting that the farm was aware of their status . . . A second source, who claimed to be an undocumented immigrant, also claimed to have worked at NuStar for several years, only recently leaving the dairy, which this source estimated employed about fifteen people.* **(Doc. 28, at 19)**

Plaintiffs allege these statements are false for a variety of reasons: (1) plaintiffs' surveillance of Lizza was legitimate because Lizza was acting suspiciously; (2) plaintiffs' concerns about Lizza were legitimate because they discovered accusations of improper sexual conduct against Lizza online; (3) plaintiffs did not surveil Lizza to stop his reporting or refute any false claims that NuStar relied on undocumented labor; (4) Lizza's sources, if they existed, were unverified and unreliable because they did not send undocumented persons to work at NuStar; (5) NuStar did not hire undocumented labor; (6) "no undocumented immigrant worked at NuStar for 'several years' further undercutting the veracity and reliability of the anonymous 'second' source;" (7) "NuStar was not 'aware of their status' and did not violate Federal law (Title 8 U.S.C. § 1324(a) by knowingly hiring an unauthorized alien;'" and (8) Lizza did nothing to verify the accuracy of his sources and failed to mention that NuStar has no reported cases of hiring undocumented workers. (Doc. 28, at 19–20).

Much of what plaintiffs allege as showing that the statements are false do nothing to prove the falsity of the statements. What plaintiffs saw and thought about Lizza ((1) and (2)), their motivation for following him (3), and whether Lizza did anything to verify the reliability of his sources ((4), (6), and (8)), does not do anything to prove the falsity of the statements. Only plaintiffs' assertions that (5) NuStar did not hire undocumented

labor and (7) NuStar did not knowingly hire an unauthorized alien assert facts subject to proof. Thus, the question is whether plaintiffs have stated a claim of defamation by asserting that defendants made false statements that plaintiffs knowingly employed undocumented or unauthorized workers.

Defendants assert that the statements are not defamatory because they do not allege that plaintiffs actually knowingly hired undocumented or unauthorized alien labor; rather, only that plaintiffs knew the status of the people whom others sent to plaintiffs for possible employment. (Doc. 37, at 28–31). Defendants point out that plaintiffs omitted some lines from the Article in which the first source stated: "I've been there and bring illegal people" and that "people come here and ask for work, so I send them over there." (*Id.*, at 23); *see also* (Doc. 33-2, at 18). Defendants argue that omitting those source statements changed the meaning of the statements to imply that plaintiffs actually hired the undocumented workers when all the statements say is that plaintiffs were sent undocumented workers for possible employment.

Defendants dice the words here too closely to withstand scrutiny. Although defendants were careful to say that the sources only sent undocumented workers to plaintiffs, the second sentence states that "NuStar did indeed rely, at least in part, on undocumented labor." (Doc. 28, at 19). If NuStar never hired any of the undocumented workers sent to it, then NuStar could not be said ever to have relied on undocumented workers. The clear gist or sting of the statements, with or without the omitted words, is that people sent undocumented workers to plaintiffs, plaintiffs knew the status of those workers, and hired them. Falsely accusing someone of knowingly employing undocumented workers is accusing someone of committing a crime. To falsely accuse a person of an indictable crime is defamatory. *Bierman*, 826 N.W.2d at 444. Falsely accusing plaintiffs of committing a crime certainly can injure their reputations, expose them to public hatred, contempt, or ridicule, or injure their business.

25

Thus, plaintiffs have alleged an actionable claim of defamation for these statements.

> **12.** ***I laid out the facts I had uncovered in Sibley, including the intimidation of witnesses. (Doc. 28, at 20).***

Plaintiffs allege this statement is false because plaintiffs "did not intimidate any of Lizza's sources." (Doc. 28, at 20). This sentence does not, however, claim that plaintiffs intimidated Lizza's sources; rather, it makes a more general assertion that Lizza's sources were intimidated. To that extent, it is not of and concerning plaintiffs. It is also Lizza's characterization or impression that his sources were intimidated. The statement does not allege facts—that is conduct—by plaintiffs that led Lizza to believe his sources were intimidated. In that sense, the statement is not provably true or false. In any event, plaintiffs do not allege in their amended complaint that the sources were not intimidated; rather, they just claim that they did not intimidate the sources. No matter how one analyzes this statement, it is not actionable defamation of plaintiffs.

Thus, as a matter of law, the Court finds these statements are not defamatory.

> **13.** ***I learned that Anthony Jr. was seemingly starting to panic. The next day, the 2009*** **Dairy Star** ***article about NuStar, the one that made me think the Nuneses were hiding something and that had led me to Sibley in the first place, was removed from the*** **Dairy Star's** ***website. Anthony Jr., I was told, had called the newspaper and demanded that the editors take the nine-year-old story down. They relented . . . According to someone who talked that day, Anthony Jr. allegedly said that he was hiring a lawyer and that he was convinced his dairy farm would soon be raided by ICE. (Doc. 28, at 20).***

Plaintiffs allege these statements are false because (1) Anthony Jr. "had no reason to panic and did nothing to indicate to anyone that he was panicked"; (2) Anthony Jr. "did not call the editors of the *Daily Star*"; (3) Anthony Jr. did not demand or put pressure on anyone to remove the story; (4) the editors did not relent to such pressure; and (5)

26

Anthony Jr. did not tell anyone he was hiring a lawyer and/or that he was convinced that NuStar would soon be raided by Immigrations and Customs Enforcement ("ICE"). (Doc. 28, at 20-21).

Whether Anthony Jr. panicked is an opinion and not an assertion of fact that is clearly provable as being false. The facts that led the author to the opinion follow the opinion. The factual assertions in this collection of statements are that (1) the 2009 *Dairy Star* article about NuStar was removed from the *Dairy Star*'s website; (2) a source told Lizza that Anthony Jr. requested removal of the article; and (3) a source told Lizza that Anthony Jr. told the source he was hiring a lawyer and was convinced ICE would soon raid his dairy. Plaintiffs do not dispute that the article was removed from the *Dairy Star*'s website and do not dispute that someone made the statements to Lizza; rather, they assert that the statements are not true. Even if they are false, they are not defamatory. Asking a publisher to remove an old article from a website is not something that would injure their reputations, expose them to public hatred, contempt, or ridicule, or injure their business. Similarly, plaintiffs' intent to hire a lawyer out of a concern that ICE could raid their business is not defamatory. There is nothing defamatory about hiring a lawyer to defend against false claims or accusations. The hiring of a lawyer is not an admission of guilt.

Thus, as a matter of law, the Court finds these statements are not defamatory.

> **14.    Is it possible the Nuneses have nothing to be seriously concerned about? Of course, but I never got the chance to ask because Anthony Jr. . . . did not respond to numerous requests for interviews. (Doc. 28, at 21).**

Plaintiffs allege that these statements are false but allege no facts to show them to be false. (Doc. 28, at 21). Rather, plaintiffs argue that the rhetorical question insinuates that they have done something that they should be concerned about. (*Id.*). Plaintiffs do not allege facts that, if true, would prove they had nothing to be concerned about.

Plaintiffs do not deny that Anthony Jr. did not respond to numerous requests for interviews.

The first sentence, a rhetorical question, simply does not constitute defamation. It does not assert a fact. The second sentence concedes that it is possible the Nuneses having nothing to worry about, and then asserts a fact that plaintiffs do not dispute. There is nothing about these statements that constitute actionable defamation.

Thus, as a matter of law, the Court finds these statements are not defamatory.

### B. Defamation by Implication

Plaintiffs fail to state a claim for defamation by implication for several reasons. First, two of the allegedly juxtaposed facts leading to the defamatory inference are not facts at all. Second, no reasonable person could draw plaintiffs' asserted implication from the Article. And last, even if a reasonable person could draw the implication, there is no indication that defendants intended or endorsed the implication.

#### 1. Defamatory Inference

Plaintiffs' amended complaint asserts that the defamatory implication of the Article is "that [p]laintiffs conspired with others . . . to hide and conceal a 'politically explosive secret'—that NuStar knowingly employs undocumented labor on its dairy farm." (Doc. 28, at 21). The amended complaint further alleges that "[d]efendants juxtaposed a series of facts so as to imply a defamatory connection between them." (Id.). The amended complaint asserts that the first "fact" is the existence of a politically explosive secret, the second fact is the existence of a conspiracy, and the third and final fact is that NuStar employs undocumented labor. (Id., at 21–22).[3]

---

[3] Plaintiffs argue alternatively that the Article accuses them of engaging in shoddy employment practices. (Doc. 41, at 20 n.9). The Article is not capable of this interpretation. Nothing in the Article asserts that plaintiffs did not employ good hiring practices or were negligent in checking the documentation of its workers. The implication, if there is one, is that plaintiffs knowingly employed undocumented or unauthorized workers.

The Court must determine as a matter of law if a reasonable reader could draw the alleged inference from the Article. *See Yates*, 721 N.W.2d at 771 (citing *Milkovich*, 497 U.S. at 16–17). Plaintiff must show that defendants' juxtaposition or omission of facts creates the false and defamatory inference. *See Stevens*, 728 N.W.2d at 827. Plaintiffs do not allege the existence of any omitted facts, and thus they rely only on the alleged juxtaposition of facts identified above to support their defamation by implication claim.

The first problem with plaintiffs' claim is that two of the alleged facts are not facts. As the Court has explained above, the Article's conclusion that there was a politically explosive secret is an opinion, not a fact capable of proof as true or not true. The same can be said of the Article's assertion that there was a conspiracy. Those are conclusions the Article draws from facts, but are not themselves facts. Thus, this is not a case where plaintiffs have pointed to true facts that an author has juxtaposed in a way to imply a defamatory meaning. As the Court has found above, the gist of a portion of the Article is that NuStar knowingly employed undocumented labor. That assertion of a fact, that plaintiffs insist is false, the Court has found states a claim of defamation. But it does so on its own, not as a result of implication by the Article's reference to a politically explosive secret or conspiracy.

Second, even if the Court assumed the reference to the politically explosive secret and conspiracy were assertions of fact, plaintiffs' defamation by implication claim would still fail because plaintiffs' assertion of the implication does not withstand scrutiny. In determining if a publication is susceptible to a defamatory implication, courts consider whether it includes statements that directly negate or tend to negate the alleged implication. *See Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 148 (D.D.C. 2017) (granting motion to dismiss defamation by implication claim because article "specifically include[d] facts that negate[d] the implications" asserted); *Wyo. Corp. Servs.*, 32 F. Supp. 3d at 1189 (finding that an article could not carry inference that

29

provider of shell corporations aided others in criminal acts when article included statements that plaintiff fully complied with the law, did not have knowledge of how its customers used the corporations, and had not been sued or sanctioned).

Reading the entire Article in context, no reasonable reader could reach plaintiffs' alleged implication because the Article negates those implications. Plaintiffs' reading would make a connection between Devin Nunes, the politician, and NuStar's employment of undocumented labor. But the Article makes it clear that it is not alleging any such connection between the politician and the operation of the NuStar farm. The Article stated that Devin Nunes had no financial interest in NuStar. (Doc. 33-2, at 17). The Article also makes clear Devin Nunes was not involved in managing NuStar. (*See id.*, at 7) (noting that the *Dairy Star* article stated that NuStar was managed by Anthony Jr. "with his son and wife" and noting in the next paragraph that Devin Nunes is not mentioned anywhere in the *Dairy Star* article). No reasonable reader could understand the Article to imply the exact opposite of its text, i.e. that Devin Nunes, the politician, had some financial interest or managerial involvement in NuStar's operations.

Likewise, no reasonable reader could read the Article to imply that Devin Nunes conspired with others to hide NuStar's use of undocumented labor. The Article is clear the alleged conspiracy was to hide the fact that Devin Nunes's family sold its farm and moved to Iowa. (*Id.*, at 7). Similarly, no reasonable reader could find the "politically explosive secret" referenced in the title of the Article is NuStar's use of undocumented labor. The Article states "[s]o here's the secret: The Nunes family dairy of political lore—the one where his brother and parents work—isn't in California. It's in Iowa." (*Id.* at 5). Given these express statements, no reasonable reader could infer that Devin Nunes was allegedly involved in a conspiracy to hide NuStar's use of undocumented labor or that the employment of such labor was the allegedly politically explosive secret. *See Deripaska*, 282 F. Supp. 3d at 148; *Wyo. Corp. Servs.*, 32 F. Supp. 3d at 1189.

30

Plaintiffs' defamation by implication claim also fails because plaintiffs have not plausibly alleged that defendants' juxtaposition of facts, rather than their own juxtaposition of words and phrases, gives rise to the defamatory inference. The term "politically explosive secret" is used only in the headline of the online version and sub-headline of the print version of the Article. All discussion of the family's secret and conspiracy to hide the move to Iowa is contained in the first 13 paragraphs of 66-paragraph Article. (*Id.*, at 2–7). Undocumented labor is not mentioned until the 35th paragraph and is first mentioned in a general statement that "Midwestern dairies tend to run on undocumented labor." (*Id.*, at 10). Three paragraphs later, Lizza reports a conversation with a local dairy farmer; Lizza asked "what the chances are that a farm the size of NuStar uses only fully legal dairy workers" to which the farmer responded "'It's next to impossible . . . [t]here's no dang way.'" (*Id.*, at 12). The Article first directly reports NuStar's alleged use of undocumented labor in the 53rd paragraph in relation to a source's statement. (*Id.*, at 18). Plaintiffs do not explain how defendants juxtaposed these facts, which are scattered at disparate points throughout the Article, to somehow imply that plaintiffs were involved in a conspiracy to hide NuStar's use of undocumented labor. Instead, plaintiffs premise their claim entirely on their own juxtaposition and repositioning of words and phrases in the Article. Viewing the Article as a whole, no reasonable reader could draw the alleged defamatory inference, and plaintiffs' subjective beliefs about the implication of the Article is insufficient to state a claim.[4]

### 2. *Subjective Intent*

Even if a reasonable reader could draw plaintiffs' tortured inference from the Article, plaintiffs' defamation by implication claim still fails. Plaintiffs must show that

---

[4] The Court acknowledges that a reasonable reader could draw the conclusion that the Article alleges that the alleged employment of undocumented workers *could* be a *reason* for conspiring to hiding the move, but the object of the conspiracy and what may have motivated it are two different things.

defendants intended or endorsed the defamatory inference. "[A] plaintiff who seeks to recover based on a defamatory implication—whether a gist or a discrete implication—must point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 635 (Tex. 2018) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (emphasis omitted)). The determination of the author's intent "often require[s] an examination of the statements in the context of the article as a whole." *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012). There is generally no evidence of intent if the relevant facts appear in different sections of an article addressing different topics. *Id.* at 467.

In their briefing, plaintiffs ignored the subjective intent requirement, and thus plaintiffs have waived any argument on this issue. *See Wells v. LF Noll, Inc.*, No. 18-CV-2079-CJW-KEM, 2019 WL 5596409, at *9 (N.D. Iowa Oct. 30, 2019) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (alteration in original) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Regardless, in their amended complaint, plaintiffs do not identify any additional, affirmative evidence in the Article or elsewhere to show that defendants intended the implication plaintiffs read into the Article.

Thus, plaintiffs' defamation by implication claim fails as a matter of law.

### C.    *Involuntary Public Figures and Actual Malice*

Defendants argue that plaintiffs are "involuntary public figures" and are thus required to allege facts showing actual malice. (Doc. 37, at 38–42). Defendants concede that this question of constitutional law—whether a private person can involuntarily become a public figure for purposes of defamation—is one of first impression in the Eighth Circuit Court of Appeals. (*Id.*, at 8–9). Plaintiffs argue that they are not involuntary public figures but, even if they are, they have adequately plead actual malice.

32

(Doc. 41, at 23–33).  For the following reasons, the Court does not find that plaintiffs are involuntary public figures.  Nevertheless, the Court will also analyze whether plaintiffs have alleged actual malice to the extent that the issue may bear on plaintiffs' claim for punitive damages.

### 1.    Whether Plaintiffs are Involuntary Public Figures

Nearly a half-century ago, the United States Supreme Court hypothesized in dicta that a private person could become an involuntary public figure, for purposes of defamation law.  In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974), the Supreme Court stated that, "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare."  In a trilogy of cases a few years later, however, the Supreme Court appeared to suggest that not only are involuntary public figures hypothetical, but perhaps mythical.  In *Time, Inc. v. Firestone*, 424 U.S. 448, 453–54, 457 (1979), the Supreme Court found that a highly public socialite was not a public figure, rejecting the idea that people could become public figures by being "drawn into a public forum largely against their own will."  In *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979), the Supreme Court refused to find the plaintiff was an involuntary public figure and concluded that defendants could not create their own defense by bringing plaintiffs into public controversies against their will.  In *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166–68 (1979), where the plaintiff was "dragged unwillingly" into a controversy over the government's espionage investigation, the Supreme Court did not address whether the plaintiff constituted an involuntary public figure.  In each of these cases, the Supreme Court had, but passed up, the opportunity to clarify its view about whether this hypothetical category of persons could really exist.  Since that time, the Supreme Court has not taken up the issue again.

33

Some federal courts[5] have found that relatives of famous people could be involuntary public figures. *See, e.g.*, *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1257–58 (5th Cir. 1980); *Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir. 1976) (wife of famous entertainer as a public figure); *Zupnik v. Associated Press, Inc.*, 31 F. Supp. 2d 70, 72 (D. Conn. 1998) (wife of physician who was the subject of highly public litigation); *Meeropol v. Nizer*, 381 F. Supp. 29 (S.D.N.Y. 1974) (children of Julius and Ethyl Rosenberg are public figures). A few other courts have found that plaintiffs may be deemed involuntary public figures simply by reason of being in the wrong place at the wrong time when a public controversy swirled around them. *Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 742 (D.C. Cir. 1985) (finding an air traffic controller was an involuntary public figure because he happened to be on duty when a plane crash occurred); *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 300 (Tenn. Ct. App. 2007) (brother-in-law of police officer considered involuntary public figure when controversy erupted over officer's alleged efforts to prevent brother-in-law's arrest). Other courts, however, have rejected the idea that the involuntary public figure exists any more than Bigfoot or the Loch Ness Monster. *See, e.g., Wells v. Liddy*, 186 F.3d 505, 513–14 (4th Cir. 1999) (rejecting idea that a person could become an involuntary public figure by sheer bad luck); *Shultz v. Reader's Digest Ass'n*, 468 F. Supp. 551, 559 (E.D. Mich. 1979) (finding that the "continued vitality" of the involuntary public figure classification was called into question by the Supreme Court's *Firestone* decision).

For purposes of this Court's analysis, it is important that neither the Eighth Circuit Court of Appeals nor the Iowa Supreme Court or Court of Appeals has recognized the existence of an involuntary public figure. If anything, the Iowa Supreme Court has suggested that it would not recognize the category. *See Jones*, 440 N.W.2d at 895 n.1

---

[5] A few state courts have similarly found plaintiffs to qualify as involuntary public figures by reason of their relationship to public figures, but notably Iowa is not among them.

("A review of the case law concerning involuntary public figures leaves the impression that this category is not merely '"exceedingly rare"' but extinct."), quoting C.W., Note, *Defining a Public Controversy in the Constitutional Law of Defamation*, 69 VA. L. REV. 931, 937 n.39 (1983)). It is not this Court's role to make law. District court judges are to apply the laws passed by legislatures or recognized by higher courts. Although this is a fascinating intellectual issue,[6] the task of making new law belongs to others.

Even were the Court to entertain the thought of making new law, it would find it inappropriate to label the plaintiffs here as involuntary public figures. The rationale for differing burdens borne by public figures and private figures in defamation suits—the requirement that public figures must also prove actual malice—is because public figures are more likely to have access to the media to minimize a defamatory statements "adverse impact on reputation," and, more importantly, public figures typically "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," thus "invit[ing] attention and comment." *Gertz*, 418 U.S. at 344–45. Here, plaintiffs do not have easy access to the media[7] and have made no efforts to resort to the media to counteract the adverse publicity. Plaintiffs also did nothing to

---

[6] And it is fascinating. The Court read many law review articles in researching this issue and would recommend in particular Jeffrey Omar Usman, *Finding the Lost Involuntary Public Figure*, 2014 UTAH L. REV. 951 (2014); Mark P. Strasser, *A Family Affair? Domestic Relations and Involuntary Public Figure Status*, 17 LEWIS & CLARK L. REV. 69 (2013); W. Wat Hopkins, *The Involuntary Public Figure: Not so Dead After All*, 21 CARDOZO ARTS & ENT. L.J. 1 (2003); and Nat Stern, *Unresolved Antitheses of the Limited Public Figure Doctrine*, 33 HOUS. L. REV. 1027 (1996).

[7] The Court recognizes that access to the media in the traditional sense the Supreme Court contemplated in *Sullivan* or even *Gertz* may be an outdated concept with the advent of social media through which private people can reach millions. *See*, Usman, *Finding the Lost Involuntary Public Figure*, 2014 UTAH L. REV. at 986–93 (discussing the erosion of the lack of access to media rationale in light of the advent of the internet and social media). But here, plaintiffs have not resorted to the internet or social media to respond to the Article.

thrust themselves into the forefront of the controversy. And this is not a case either where their relative, Devin Nunes, thrust himself into the controversy and brought his family along with him. Defendants created the controversy by investigating plaintiffs' move first, and then their alleged employment of undocumented workers. Defendants should not be able to place a barrier to being sued for defamation by their own actions in drawing plaintiffs into a controversy defendants created. The media needs the protection afforded them by the additional requirements for public figures to sue them for defamation because "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270; *see also Bertrand*, 846 N.W.2d at 901–02 ("Among public figures and officials, an added layer of toughness is expected, and a greater showing of culpability is required under our governing legal standards to make sure the freedom of political speech . . . is not suppressed or chilled."). But the media also needs to be cautious in their pursuit of public issues and public figures so as not to cause collateral damage to private individuals who have not stepped into the public arena.

## 2. Whether Plaintiffs Pled Actual Malice

Were the Court to find that plaintiffs were involuntary public figures who had to prove defendants acted with actual malice, it would find that they failed to allege facts in their complaint sufficient to meet that standard. "Actual malice" means the defendant published the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. The publisher of a statement acts with "reckless disregard" when it has a "high degree of awareness of . . . probable falsity." *Gertz*, 418 U.S. at 332 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Reckless disregard is not based on an objective standard; the plaintiff must offer facts to indicate the defendant subjectively had serious doubts about the truth of the

36

statement. *Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004); *Reader's Digest Ass'n v. Superior Court of Marin Cty.*, 690 P.2d 610, 619 (Cal. 1984). A plaintiff must plead specific facts to create a reasonable inference that the defendant acted with actual malice. *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020).

Actual malice in the First Amendment context is distinct from common law actual malice. Under the First Amendment, actual malice "has nothing to do with bad motive or ill will[.]" *Bertrand*, 846 N.W.2d at 898–99 (quoting *Harte-Hanks Commc'ns v. Connaughton,* 491 U.S. 657, 666 n.7 (1989)); *see also Makaeff v. Trump Univ., LLC*, 26 F. Supp. 3d 1002, 1008 (S.D. Cal. 2014). Thus, antagonism, contempt, or intent to inflict harm are insufficient to show actual malice; the plaintiff must show an intent to inflict harm through falsehood. *McCarney v. Des Moines Register & Tribune Co.*, 239 N.W.2d 152, 156 (Iowa 1976). Standing alone, reliance on biased or unreliable sources, failure to investigate, *Bertrand*, 846 N.W.2d at 895, or failure to adhere to journalistic standards, *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 665, are insufficient to show actual malice.

Defendants argue plaintiffs have not plausibly alleged defendants acted with "actual malice." (Doc. 37, at 41–42). Defendants assert plaintiffs' complaint is "larded with conclusory allegations" and not facts. (*Id.*, at 41). Plaintiffs argue that their allegations as a whole create an inference that defendants acted with actual malice. (Doc. 41, at 29–33). Their brief on this issue, however, contains no real analysis; instead, it consists of an assertion that the complaint is sufficient, followed by three pages of string cites without application to the facts of this case.

The Court will not reiterate every factual deficiency in the amended complaint, but some examples are illustrative. Plaintiffs assert that defendants acted with actual malice because they failed to observe journalistic standards, conceived of a storyline in

advance and sought to find evidence to confirm that story, and relied on unreliable or biased sources in researching the Article. (Doc. 28, at 27). These allegations, however, are "naked assertion[s]" devoid of "further factual enhancement," and "labels and conclusions," that fail to plausibly assert actual malice. *See Twombly*, 550 U.S. at 555, 557.

Plaintiffs also allege defendants "relied on unknown sources, including anonymous and unnamed persons, they knew were wholly unreliable and had an axe to grind against Plaintiffs[.]" (Doc. 28, at 28). Plaintiffs do not identify the sources, what axe the sources had to grind with them, or any factual basis from which the Court could plausibly find that defendants' sources were unreliable or that defendants knew or should have known they were unreliable. To the contrary, the Article itself refers to two unnamed, but not anonymous, sources who had firsthand knowledge of NuStar's use of undocumented labor. (Doc. 33-2, at 16, 18). The facts plaintiffs allege here are not the type to show actual malice. *See Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) (noting that evidence of an ulterior motive can "bolster an inference of actual malice," and citing specific facts about the relationship between the parties from which the jury could have found that defendant made defamatory statements with actual malice); *AdvanFort Co. v. Mar. Exec., LLC*, No. 1:15-cv-220, 2015 WL 4603090, at *8 (E.D. Va. July 28, 2015) (finding that the plaintiff could plausibly allege actual malice if the plaintiff specifically asserted that the defendant knew the author's relationship with the plaintiffs had "gone sour" after their past "unsuccessful business relationship"); *Barreca*, 683 N.W.2d at 123 (reversing summary judgment when record established the defendant made defamatory statements based on one anonymous and unverified phone call, and portions of the statements at issue arguably showed the defendant "entertained serious doubts about the truth of the phone call").

Similarly, plaintiffs allege defendants acted with actual malice because they republished the Article by linking it on Twitter. (Doc. 28, at 13, 26). This argument fails both factually and as a matter of law. Publishing a link to an existing story is not a republication of the story. *See Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *8 (S.D. Cal. Mar. 7, 2007) (holding that linking to an article "is more reasonably akin to the publication of additional copies of the same edition of a book, which is a situation that does not trigger the republication rule" for purposes of the statute-of-limitations). Even if tweeting links to the Article constitutes republication, it does not show actual malice. In *Bertrand v. Mullin*, 846 N.W.2d at 901, the Iowa Supreme Court noted "[i]t goes without saying that a speaker who repeats a defamatory statement after being informed of the statement's unambiguous falsity does so at the peril of generating an inference of actual malice." Plaintiffs allege "[p]rior to filing this action, Plaintiff gave notice to Defendants and made a demand for retraction[s]," (Doc. 28, at 28), but the amended complaint does not state that this occurred before the alleged republications, or that the demand informed defendants of the "unambiguous falsity" of the statements. *See Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) ("[M]ere denials, however vehement . . . are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.").

Plaintiffs cite *Jones v. University of Iowa*, 836 N.W.2d 127, 149 (Iowa 2013), for the proposition that "actual malice may be shown by 'excessive publication.'" (Doc. 41, at 31). The court in *Jones* stated that a speaker loses the protection of qualified privilege against defamation claims when "the speaker acts with actual malice, or exceeds or abuses the privilege through, for example, excessive publication or through publication to persons other than those who have a legitimate interest in the subject of the statements." 836 N.W.2d at 149 (quoting *Theisen*, 636 N.W.2d at 84). The court then clarified its

discussion of excessive publication related only to privilege, not actual malice. *See id.* ("[Q]ualified privilege by its very nature does not allow widespread or unrestricted communication." (quoting *Spencer v. Spencer*, 479 N.W.2d 293, 297 (Iowa 1991))). The court analyzed the actual malice and privilege separately and discussed excessive publication only in its analysis of qualified privilege. *Id.* at 150. It is apparent from the Iowa Supreme Court's opinion that excessive publication only defeats qualified privilege but is not evidence of actual malice.

Plaintiffs' complaint relies on "naked assertion[s]" and "labels and conclusions" which are devoid of "further factual enhancement," to establish actual malice. *See Twombly*, 550 U.S. at 557. Plaintiff cannot rely on general assertions and must plead facts to support a finding of actual malice. *Nelson Auto Ctr., Inc*, 951 F.3d at 958. Even if a reasonable reader could find the challenged portions or implications of the Article to be false and defamatory, plaintiffs failed to plausibly allege defendants acted with actual malice.

D.     *Federal Rule of Civil Procedure 12(f)*

Federal Rule of Civil Procedure 12(f)(1) permits a court, on its own motion, to strike from a pleading any "immaterial, impertinent, or scandalous matter." "Courts have broad discretion under Rule 12(f), but striking pleadings is an extreme measure, so such motions "are viewed with disfavor and are infrequently granted." *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000) (quoting *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir.1977)). Thus, the Court should not strike matters in the complaint that are not strictly relevant "if they provide 'important context and background' to claims asserted or are relevant to some object of the pleader's suit." *Holt v. Quality Egg, L.L.C.*, 777 F. Supp. 2d 1160, 1169 (N.D. Iowa 2011) (quoting *Stanbury*, 221 F.3d at 1063).

"Allegations may be stricken if they have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones." *Jameson v. State Farm Mut. Auto. Ins. Co.*, 871 F. Supp. 2d 862, 867–68 (W.D. Mo. 2012) (alteration, citation, and internal quotation marks omitted). Matters are "immaterial" if they "have no essential or important relationship to the claim for relief." *Resolution Tr. Corp. v. Fiala*, 870 F. Supp. 962, 977 (E.D. Mo. 1994). Similarly, matters are "impertinent" when they "do not pertain to the issues in question." *Id.* Scandalous matters are those that cast a derogatory light on someone, usually a party, and bear no relation to the controversy or prejudice the objecting party. *Wilkerson v. Butler*, 229 F.R.D. 166, 170 (E.D. Cal. 2005).

As the Court noted already in a footnote, plaintiffs' amended complaint contains spurious allegations against Lizza. Those allegations are immaterial, impertinent, and scandalous. Plaintiffs' personal attacks on Lizza have no bearing on this case. Why plaintiffs or their neighbors allegedly had concerns about Lizza or followed him is irrelevant to this case. The irrelevancy of the spurious allegations against Lizza is apparent because plaintiffs never refer to them in resisting defendants' motion to dismiss. The allegations likewise are prejudicial to Lizza and have criminal overtones. *See Jameson*, 871 F. Supp. 2d at 867–68.

Thus, the Court will, as part of this order, require plaintiffs to file a second amended complaint. That amended complaint should be stripped of all such spurious allegations and plaintiffs are not to file any further public pleadings referencing such matters without first obtaining leave of the Court and showing that there is a good faith factual basis for the allegations and that they are relevant and material to some matter at issue in this litigation.

## IV.    CONCLUSION

For these reasons, defendants' motion to dismiss (Doc. 33) is **granted in part** and **denied in part**.  The Court grants the motion to the extent it seeks dismissal of all claims of defamation except for the one statement identified above in Section III(A)(11). Plaintiffs are to file a second amended complaint that is devoid of allegations of defamation as to any other part of the Article and, as directed in Section III(D), stripped of any irrelevant and spurious allegations against Lizza.  This case will proceed forward based only on a claim that defendants defamed plaintiffs by falsely alleging that they knowingly employed undocumented workers.

**IT IS SO ORDERED** this 11th day of September, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

42