IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

ANTHONY NUNES, JR., ANTHONY
NUNES, III, and NUSTAR FARMS, LLC,

      Plaintiffs,

   vs.                           No. C20-4003-CJW

RYAN LIZZA and
HEARST MAGAZINE MEDIA, INC.,      TRANSCRIPT OF
                                 16(b) and 26(f)
      Defendants.           SCHEDULING CONFERENCE
_____/

      The Telephonic Hearing held before the Honorable
Mark A. Roberts, Magistrate Judge of the United States
District Court for the Northern District of Iowa, at the
Federal Courthouse, 111 Seventh Avenue Southeast, Cedar
Rapids, Iowa, December 3, 2020, commencing at 8:57 a.m.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:20-cv-04003-CJW-MAR Document 67 Filed 01/12/21 Page 1 of 48

```
APPEARANCES

For the Plaintiffs:      STEVEN SCOTT BISS, ESQ.
                         Law Office of Steven S. Biss
                         Suite 102
                         300 West Main Street
                         Charlottesville, VA  22903

For the Defendants:      JONATHAN R. DONNELLAN, ESQ.
                         NATHANIEL S. BOYER, ESQ.
                         SARAH PARK, ESQ.
                         The Hearst Corporation
                         Suite 40th Floor
                         300 West 57th Street
                         New York, NY  10019

                         MICHAEL A. GIUDICESSI, ESQ.
                         Faegre, Drinker, Biddle & Reath
                         33rd Floor
                         801 Grand Avenue
                         Des Moines, IA  50309

Transcribed from         Shelly Semmler, RMR, CRR
digital recording by:    320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846
```

```
 1              THE COURT:  Good morning.  The case before the
 2      Court is Nunes versus Ryan Lizza, et al.  I understand we
 3      have Mr. Biss on for the plaintiff; is that correct?
 4              MR. BISS:  Yes, sir.  Good morning, Judge.
 5              THE COURT:  Good morning.  For the defendants I
 6      understand we have Mr. Donnellan, Mr. Giudicessi,
 7      Mr. Boyer, and Ms. Park.  Did I miss anybody?
 8              UNIDENTIFIED MALE VOICE:  That's everyone, Your
 9      Honor.  Good morning.
10              THE COURT:  Good morning.  We have a lot on our
11      plates this morning.  And I've read the letters from both
12      sides and looked at the docket some.  I think just as
13      kind of a checklist for me so I don't miss anything, I'm
14      going to kind of start with the letter from Mr. Boyer,
15      not that I agree with everything in it, but I think it's
16      a good outline of what I think we need to deal with this
17      morning, the first being, I believe, the proposed
18      scheduling order.  And I appreciate you sending a
19      proposed scheduling order and narrowing down the issues.
20      It seems to me -- Mr. Biss, you certainly correct me if
21      I'm wrong -- that the remaining issue is how long
22      discovery is expected to take.  And obviously you would
23      like it to get to trial a little sooner than the
24      defendants, it appears.
25          I hope you know that this case -- well, I don't
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduction without permission of the transcriber is prohibited*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 3 of 48

```
 1  think I'm going out on a limb by saying this isn't the
 2  run-of-the-mill case for the Northern District of Iowa,
 3  probably for many courts.  So looking through it, it
 4  looks like there might be more discovery issues than
 5  sometimes we see.  At least there are early on.  And I
 6  think I'm inclined to go with the defendants' proposal
 7  with a little bit of a longer period of time for
 8  discovery to be completed.
 9      I think those of you who've practiced in the
10  Northern District of Iowa know that we're not in the
11  practice of setting deadlines and routinely kicking the
12  can down the road.  So it might provide you a little bit
13  of comfort, Mr. Biss, that none of the parties should
14  expect additional continuances without extenuating
15  circumstances.  So I think that addresses the issues on
16  the proposed scheduling order, and we'll get one out.
17      Is there anything else we need to talk about on --
18  with respect to the scheduling order?  The other
19  deadlines and the length of time for them seem to be
20  workable within the parameters that are in the scheduling
21  worksheet.
22      Hearing nothing, I'm moving on to Roman numeral 2,
23  the responses and objections to NuStar's document
24  requests.  It seems like maybe after the continued meet
25  and confer that perhaps the resolution of the motion to
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Keyboard is incomplete copy of the transcript.*
Case 5:20-cv-04003-CJW-MAR Document 67 Filed 01/12/21 Page 4 of 48

```
 1   compel is sort of wholly dependent upon getting a
 2   proposed protective order actually in place.  Is -- am I
 3   correct on that?
 4           UNIDENTIFIED MALE VOICE:  This is --
 5           MR. BISS:  Judge --
 6           UNIDENTIFIED MALE VOICE:  Go ahead.  Go ahead.
 7           MR. BISS:  I was just going to say -- this is
 8   Steve Biss, Judge -- I think that's correct, and I'll --
 9   subject to my colleagues responding.
10           UNIDENTIFIED MALE VOICE:  Yes, that is correct,
11   Your Honor.
12           THE COURT:  Okay.  Then let's visit then about
13   the proposed protective order.  I take it the only
14   remaining issue with the protective order is sort of
15   highlighted or literally highlighted in the track changes
16   document and it has mainly to do with whether people
17   other than testifying experts would be allowed to see
18   documents and the plaintiffs' concern that sensitive
19   documents might leak.  I guess I'll hear from you about
20   that, Mr. Biss, since that's your concern.
21           MR. BISS:  Yes, sir.  Thank you, Judge.  You
22   hit the nail right on the head.  We are -- we're -- my
23   clients are very concerned about leaks.  And when I say
24   leaks, I mean disclosures to third parties.
25       For instance, of course, as we alleged in the
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Unpurchased incomplete copy of the transcript*
Case 5:20-cv-04003-CJW-MAR  Document 67  Filed 01/12/21  Page 5 of 48

amended complaint and as the Court may know, after this
article was published in September of 2018, there were
immediate and basically incessant threats of reporting my
clients to ICE or other government authorities,
accusations that my clients are committing federal crimes
and violating the law.  It's been nonstop, Judge.  I
mean, it's been nonstop.  We produced in discovery some
of the voice recordings that we had received at the time
of the 26(a) disclosures.  I think there's more.

So that's one of the concerns about -- about leaking
or disclosure of counsel's eyes only information.  That's
really what we're talking about is information that's
designated as counsel's eyes only.

My clients are also concerned about CNN.  They're
also concerned about camera crews showing up at either
the dairy farm or at the homes of their workers.  And
it's a real -- these are real concerns.  It's not a
speculative concern.  After this article was published
September 30, 2018, either on that day or the very next
day, CNN camera crews showed up in Sibley, and it is --
it can only lead to what I'll call disastrous results for
this case, to have camera crews showing up at witnesses'
homes.  It will do no good.  And I can elaborate on that
if the Court wants me to.

But it seems to me that we want to have a -- both

```
 1   parties want to have a full and fair opportunity to

 2   develop the evidence, to litigate their respective

 3   positions.  And so the concerns my client has about the

 4   highly sensitive nature of their employment information

 5   and their hiring information warrants extra -- warrants

 6   some extra protection and careful consideration here.

 7       The other thing that I want to call to the Court's

 8   attention is recently we've had -- we've had people

 9   trespassing on the dairy farm, installing all sorts of

10   signs and things like that.  And again, it just

11   reenforces my clients' concerns about the disclosure of

12   information about their workers, about their hiring

13   documents and things like that.  So that's the main

14   concern here about the leaking.

15       When I -- and I will say this, that my colleagues

16   and I have worked really hard on this protective order.

17   I want to -- I do -- I like to give credit, Judge, where

18   credit's due.  And credit's due I think to all counsel

19   here to try to put together a document that will

20   facilitate discovery.  That's the goal here.  The goal is

21   to facil -- my goal -- and I think it's shared by my

22   colleagues -- is to facilitate discovery and to put

23   together a framework that allows for what I call a

24   pragmatic approach to litigation, that is, one that

25   allows the parties to conduct their respective
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Reproduction without permission of the transcriber is prohibited*

Case 5:20-cv-04003-CJW-MAR Document 67 Filed 01/12/21 Page 7 of 48

litigation, their discovery and things like that, but at
the same time recognizes that both parties with regard to
certain information share a desire to protect it.

And I think that when I put together the counsel's
eyes only paragraph 8, my intention was to address the
concern about disclosure.  And my concern with the
redline, with the document I think Your Honor's looking
at and that we're all looking at here, my concern with
the revisions proposed by opposing counsel is that it's
too broad now because what they're proposing is that it
not only be -- that the counsel's eyes not only be
limited -- be able to be disclosed to counsel but outside
vendors.

Now, I can't con -- we can't control that.  Once it
goes to outside vendors, there is no way to control it.
And I would suggest that's too broad.

Now, again, with regard to court reporters, I had
proposed court reporters who are engaged to take
depositions or hearings in the case but limited -- but
limited to documents can't be presented to the court
reporters, documents can be open only to transcribe
testimony but can't -- but can't be given to the court
reporters generally.  Again, the goal here is to ensure
to the best we can ensure that documents don't get
leaked.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Reproduction of incomplete copy of a transcript
Case 5:20-cv-04003-CJW-MAR    Document 67    Filed 01/12/21    Page 8 of 48

 1      With regard to outside independent persons, I think

 2 that category is too broad.  What I proposed was

 3 testifying experts.  I think my colleagues wanted to have

 4 some flexibility there and be able to disclose counsel's

 5 eyes only documents to consulting experts.

 6      Your Honor, I would suggest the only person who

 7 really needs to see these documents, these kinds of

 8 documents, are testifying experts in the case.  And then

 9 with regard to -- with regard to witness -- depositions

10 and things like that, we don't feel that these documents

11 need to be shown to any witnesses whatsoever.  The

12 witnesses can be asked questions.  For instance, will --

13 there's an individual who's identified in the article at

14 issue by the name of Flavio.  The plaintiffs' documents

15 will identify Flavio.  They will identify various pieces

16 of evidence which I won't go into on this call but

17 various pieces of evidence that will identify Flavio's

18 Social Security Number, his address, et cetera,

19 et cetera.

20      All these are in our view highly, highly

21 confidential documents.  We don't want to have -- my

22 clients don't want to have their workers harassed.  They

23 don't want to have their workers in fear of cameras

24 showing up at the door.  So during a deposition Flavio

25 can be asked questions.  In the deposition there's a --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduction without permission of the transcriber is prohibited*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 9 of 48

 1  the protective order allows for the deposition to be

 2  effectively sealed or protected.  He can be asked where

 3  he lives.  He can be asked what his Social Security

 4  Number is.  The documents don't need to be shown to the

 5  witness.

 6       And so, again, we would ask for the Court to enter

 7  the protective order, paragraph 8, that the plaintiffs

 8  proposed.

 9       The concern, Judge, is that once -- once the

10  documents get leaked by some person who is not

11  controllable, then the documents are gone.  Then we've

12  lost -- we've lost the hard work that we've done here to

13  protect the privacy.  These third parties in my

14  respectful opinion, for instance, the workers at NuStar,

15  they deserve the maximum protection of their privacy, the

16  maximum that we can afford.

17       And it sort of -- those comments sort of dovetail

18  with one of the concerns that I raised in response to one

19  of the defendants' interrogatories, and that was I

20  propose to redact certain information on the documents.

21  For instance, I propose to redact certain of the digits

22  of the Social Security Number consistent with Rule 5.2,

23  redact certain of the personal identifiers so that,

24  again, we could ensure that the privacy of these third

25  parties is protected.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Court Produced Computer-Aided Transcription*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 10 of 48

     1          So, Judge, that's 8 -- that's my response I think
     2     hopefully to Your Honor's question on 8 -- on paragraph
     3     8.  Again, I think the -- I think the proposals by the
     4     defendant are just too broad.  And perhaps counsel can
     5     continue to work on that.  But I just think as the
     6     proposal by the defendants exists -- I think it was a
     7     November 30 revision -- it's too broad.
     8          And then on -- then on paragraph 9 there's a --
     9     Mr. Boyer had deleted a sentence that I included.  In
    10     paragraph 9, Judge, the deleted material, the concern
    11     there is -- and I would submit to Your Honor it's a
    12     legitimate concern.  The concern is that the transmission
    13     of documents through the internet is not secure.  By any
    14     stretch of the imagination, it's not secure.
    15          And again, it dovetails with my concerns on
    16     paragraph 8 about the privacy.  We don't want any third
    17     party who may or may not inadvertently receive documents
    18     or hack into a law firm or hack into a outside vendor to
    19     get access to this.
    20          Now, that may seem farfetched in a perfect world,
    21     but we don't live in a perfect world.  And as Your Honor
    22     knows, these -- and I think you actually made the comment
    23     here.  These are not ordinary plaintiffs.  These
    24     plaintiffs are ordinary farmers.  There's no question
    25     about that.  They're dairy farmers in Sibley, Iowa, but

*Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov*
*Court Reporter - Official Transcript*
Case 5:20-cv-04003-CJW-MAR  Document 67  Filed 01/12/21  Page 11 of 48

1   they happen to be relatives of a United States

2   Congressman who is an extremely high-profile individual

3   and who is targeted every single day by people.

4       So it should not -- it should be a concern about

5   every -- by everybody that people would -- third parties

6   would want to gain access, whether that's legally or

7   illegally, to material related to this case that could be

8   used to hurt Devin Nunes.  And it's a major concern of

9   ours.  We don't want this litigation interrupted for any

10   reason.  We don't want information being leaked out for

11   any reason.  We don't want any third parties to have

12   access to information for any reason.

13       And so I simply put a sentence in paragraph 9 that

14   the documents not be transmitted via the internet.  For

15   instance, it's pretty easy to do.  All of our counsel's

16   eyes only documents would consist, Judge, probably of 200

17   pages, maybe 300.  And it's very easy to print those off

18   and then Fed Ex them to counsel.  So, I mean, Fed Ex,

19   again, is I think probably the most secure way.  Or

20   perhaps counsel has a proposal for a -- you know, to

21   ensure that the documents are -- if they're transmitted

22   via the internet, they can be transmitted by some very

23   secure Virtual Private Network or something like that.

24       I'm not sophisticated enough, Judge, to know all

25   that computer stuff.  I have to tell you.  But I am

```
1   sophisticated enough to know that people can hack into
2   computers and they do it just about every minute of every
3   day.
4        So those are the only two -- those are the only two
5   concerns.  I think otherwise, you know, we're agreed on
6   every other provision in the revised protective order.  I
7   agree with the -- with 17 which is the 502(d) proviso.  I
8   agree with that.  I don't have any problem with that at
9   all.
10       So I think, Judge, that's it.  I don't think there's
11  anything else that the parties dispute or disagree with
12  on the -- on the protective order.
13            THE COURT:  Okay.  Thank you, Mr. Biss.  I can
14  see this is kind of a multi-layered problem.  You have
15  legitimate concerns about sanctity of people's Social
16  Security Numbers.  You've got legitimate concerns about
17  documents being leaked.
18       On the other hand, it does seem that the sort of
19  information that there's -- there doesn't seem to be a
20  claim that what the defendants are looking for isn't
21  relevant to their case and they need to look at this
22  information to ascertain if -- you know, the truth or the
23  falsity of the remaining claims in the lawsuit.
24       So as complicated as it may be, it kind of boils
25  down to an operational security sort of issue, and that
```

 1   is how these documents are transmitted and then how they

 2   are maintained to ensure the operational security.

 3       I don't know as limiting the people who can see

 4   these to testifying experts.  I'm not sure what about

 5   that magical term that they're testifying as opposed to

 6   nontestifying makes it more or less secure.

 7       It seems to me that it still comes down to carefully

 8   disseminating them to people in a way that they can

 9   analyze the documents and determine whether those people

10   that they're looking at are properly documented or not

11   and then preserving the sanctity of that information so

12   it's not leaked.

13       And it kind of strikes me that the protective order

14   as it's written now -- and maybe it doesn't need to lay

15   that out.  But it seems to me that certainly Hearst is

16   sophisticated I would -- I would assume in its ability to

17   come up with some procedures for obtaining the documents,

18   making sure that only people who have a legitimate need

19   to know and who are analyzing for the purposes I've just

20   been discussing, those are the people who see them.  What

21   am I missing here from Hearst's perspective, and how is

22   that going to actually work in practice?

23           MR. BOYER:  This is Nathaniel Boyer for Hearst,

24   Your Honor.  So I think you're -- you're getting it just

25   about right, Your Honor.  I would start from the top and

Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov
Court Produced Electronic Transcript
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 14 of 48

```
 1    say I think you are correct to say that paragraphs 8 and
 2    9 address different things.  Eight is who can see the
 3    documents, and nine is the manner by which the
 4    document -- this traditional sentence which plaintiff
 5    wanted to add to 9 and 9 generally is the manner by which
 6    documents are distributed and making sure it's done in a
 7    certain way.
 8        Before (insufficient audio) me start with 8, and
 9    I -- I say this not lightly, but I am trying not to be a
10    little insulted by plaintiffs' concern that documents
11    which are produced on a counsel's eyes only basis would
12    leak to CNN or the like.  I -- this is -- we are officers
13    of the Court.  We take our obligations seriously, and
14    there is simply no reason to lead us or our agents we
15    engage and who sign on and agree to be bound by the terms
16    of the protective order and subject to the personal
17    jurisdiction of this Court for any issues that arise with
18    that that they would then be engaging in any sort of
19    untoward conduct.
20        So I -- while I can certainly understand why it
21    may -- plaintiffs may not have had a pleasant experience
22    as they perceive it when it comes to media coverage at
23    some point in time in the past, it's neither here nor
24    there.  It's something of a non sequitur.  It's just a
25    (insufficient audio) concern when it comes to 8 as to who
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Your Deposition Net - Filed 01/12/21 Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 15 of 48

can see this.  And we need to be able to share these

documents with these entities in order to (insufficient

audio) our defense in this case.

Your Honor hit the nail on the head when you said

that there's a serious issue in this case as to the truth

or falsity of the reporting and to share as is

appropriate and subject to appropriate safeguards

sensitive information with appropriate people that

includes consulting experts.  That includes experts.

That includes witnesses whom have a reasonable basis as

is set forth in the protective order to review the

documents.  That includes things like -- I believe we

have the outside vendors.  That would be e-discovery

persons who just happen to host the document, for

example, on a platform which can be reviewed.

These are things which so long as the safeguards are

in place and this Court obviously we have no doubt and we

like to think that plaintiff has no doubt with the

Court's ability to enforce its own orders are bound by

the terms pursuant to paragraph 8.  So that's the cat --

that's the question of who.

On the question of the safeguards concerning 9, I

mean, this -- plaintiffs' concerns that hacking could

occur, while, sure, I guess things can be hacked, I do

think it's rather speculative, and it's assuming that

```
 1   people are going to engage in criminal conduct of hacking
 2   in order to access documents to which they otherwise
 3   would not have access.
 4        The phrase that documents should not be transmitted
 5   by counsel or any person via the capital I, Internet,
 6   pretty broad -- I mean, are we talking just e-mails?
 7   Could you set up share drives in which things can be
 8   used?  I referenced the use of just the e-discovery
 9   vendor who obviously all these sorts of institutions
10   would have safeguards in place to try to do everything to
11   prevent hacking and password protections and everything
12   like that.  What about things like sending -- creating a
13   scan of a document so that you can save it on your
14   computer or it gets transmitted through a Local Area
15   Network?  I mean, if nothing else, this sentence that
16   plaintiff wants to add to 9 raises a whole host of
17   questions as to what it means.
18        We are happy to have a discussion about the vast
19   ways to safeguard what I think both parties can agree is
20   both sides will be producing sensitive confidential
21   information.  We have all the same interests in secure
22   systems as plaintiffs do, and I will certainly agree with
23   plaintiffs the parties are working collaterally to
24   address this concern.
25        But that sentence I just wanted to add I recommended
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Your Discount Electronic Legal Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 17 of 48

```
 1   cutting it because I -- we think it's at a minimum vague
 2   but probably too broad in order to accomplish whatever
 3   legitimate gains the parties may have here.
 4            THE COURT:  Well --
 5            MR. BOYER:  And that covers the two items, and
 6   I'm happy to answer any other questions the Court may
 7   have.
 8            THE COURT:  Okay.  Thank you for that,
 9   Mr. Boyer.  I guess I'm leaning toward allowing the
10   defendant to be able to show or share information as it
11   needs with nontestifying experts.  I'm sort of
12   sympathetic with Mr. Biss about not being the computer
13   person who could tell you how that's supposed to work,
14   but, of course, he may have -- and I think he should
15   have -- legitimate concerns.  It seems unlikely that
16   Hearst Corporation is going to hire mom and pop
17   e-discovery service that has -- uses Google Docs or
18   something to manage the e-discovery in this case.
19       But I think it's appropriate for the parties to meet
20   and confer and come up with, you know, the who, how, and
21   the safeguards that are being put in place for
22   e-discovery and, you know, being able to get some
23   assurances from legitimate vendors about how any
24   documents in this case are going to be managed.
25       You know, I don't think you can have a very
```

```
 1   significant case in federal court anymore that involves
 2   many documents that you're not using a third-party vendor
 3   sometimes to, you know, get all the e-mails and get all
 4   the underlying documents and things like that and then
 5   manage them and sort them and search them and look for
 6   terms without using them.
 7        But I think you really need to in this case confer
 8   and find, you know, a legitimate vendor that has
 9   protections in place so that they're not being hacked by
10   anybody because it's not just people who might be
11   concerned about poking into Nunes' business.  It might be
12   people who are looking for Social Security Numbers.
13        So I'm not inclined to prevent e-discovery in this
14   case as might be sort of included in that last sentence
15   in paragraph 9.  But I do think the parties, as I said,
16   need to meet and confer and come up with the details
17   about how that's actually going to be -- to be managed in
18   a way that's secure.
19        Do I have this document in Word form with the track
20   changes so that I can tinker with it as need be to tell
21   you what I'm going to ultimately enter or ultimately
22   enter the order?
23             MR. BISS:  Judge, this is Steve Biss.  Yeah, it
24   was attached to the e-mail that I sent to Your Honor with
25   my -- with my letter.
```

```
 1            THE COURT:  All right.
 2            MR. BISS:  So you should have -- you should
 3  have it with the redline track changes in there.
 4            THE COURT:  Okay.  I'll -- I'll look at that
 5  again more closely and accept and reject, but I think
 6  it's going to be on sort of the terms I talked about.
 7  I'm not -- I do -- I know I'm repeating myself.  There
 8  does need to be security, but the plaintiff has made
 9  claims that it's necessary for the defendant to be able
10  to get that information and be able to analyze it with
11  appropriate experts.
12       So I think that takes us to Roman numeral 4,
13  plaintiffs' response to objections to defendants'
14  document requests.  Someone want to --
15            MR. BOYER:  Yes, Your Honor.  This is Mr. Boyer
16  again for Hearst.  Would you like me to -- to kick that
17  off?
18            THE COURT:  Well, let me see here.  I guess
19  let's kind of -- let's kind of break it down and go with
20  the individuals before just kind of -- kick our
21  individual items here rather than just kind of kick off
22  general discussion of it.
23       The first one appears to be the issues bearing on
24  the truth or substantial truth of the reporting.  The
25  first objection is to the time period for the time of the
```

1  documents that are going to be produced.  I think that's

2  on page 6.  Is that the first objection we need to talk

3  about?

4       UNIDENTIFIED MALE VOICE:  Yes, Your Honor.  And

5  this particular objection, it ends up being relevant to

6  both the issue of the truth, falsity, or substantial

7  truth of reporting and plaintiffs' allegation to prove

8  damages depending on which documents you end up talking

9  about in a given context.  But yes, I can start off with

10  a time period if the Court would like to start there.

11       THE COURT:  Well, let me -- let me tell you

12  what I'm thinking of doing here.  I tell people sometimes

13  mostly facetiously that when I have these conferences I

14  get out my crystal ball and I tell people how it's likely

15  to come out if they were to spend their client's time and

16  money thoroughly briefing them, and that's sort of what

17  I'm doing here.

18       But I want to be really careful in this case to let

19  you know that that's all I'm doing here.  You haven't had

20  an opportunity to fully brief these things, and I'm kind

21  of giving you my thumbnail view of how it's likely to

22  come out.  And sometimes that's all parties need to get

23  over a hurdle and get on with their discovery, but

24  obviously this is not the run-of-the-mill case, and there

25  may be cases or authorities that the parties might want

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Court Reported Computer-Aided Transcription*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 21 of 48

```
 1   to cite in a brief.  God forbid I would encourage people
 2   to file motions and briefs, but obviously if there are
 3   other records that we need to -- record we need to make
 4   on these, we can do that more formally.  But that's all
 5   I'm really doing here in terms of some of these is
 6   telling you how I think it would come out.
 7        With that said, Mr. Boyer, if you wanted to say
 8   something more than you have here in your letter about
 9   the time period, please do.
10            MR. BOYER:  I do think the letter covers the
11   time period under both the truth/falsity section and the
12   damages section, and I'm happy to answer -- elaborate and
13   answer any questions.  I will point out one thing which I
14   don't know if we hit upon directly in the letter or
15   didn't say clearly enough.
16        I am wholly unclear as to what the burden would be
17   on plaintiff for expanding the time period significantly
18   beyond what plaintiff has proposed.  I understand, for
19   example, when it comes to financial records plaintiff has
20   an accountant.  I don't have -- it hasn't been made clear
21   to me that there's any burden associated with having the
22   accountant pull records from further back or further
23   forward or whatever it is.
24        So I just want to emphasize I have a -- in addition
25   to the points being made in the letter which we'd stand
```

1   by and I can elaborate on, I was -- I don't know if I

2   understand the burden would be on plaintiffs for

3   producing them.

4           THE COURT:  Okay.  And then, Mr. Biss, you

5   know, with the thought of, you know, what I'm seeing

6   here -- and this isn't perhaps your sole opportunity if

7   you wanted to make further record on it and if it -- if

8   we need to, what's your thought on the time period?

9           MR. BISS:  So, Judge, the -- here's my thought

10  on the time period, and I start and I sort of end with

11  the article at issue in this case.

12      So we've done a -- we've done a thorough review of

13  the article as -- as the Court has done in connection

14  with the motions, as opposing counsel has done.  And

15  there are -- there is only one instance in this article

16  in which the time period of the so-called unlawful

17  hirings is identified.  There's only one witness that is

18  identified in the article as being employed at NuStar and

19  who worked there for several years.  And during the time

20  he worked there, he doesn't even say that he has any

21  firsthand knowledge of unauthorized workers.

22      But let's -- let's start with the time frame because

23  my issue on discovery, this issue, is proportionality and

24  relevance.  So I think my view is that in order for the

25  defendants to prove the truth and substantiality, they're

Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov
Your Daily Complete Filed Legal Transcript
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 23 of 48

going to have to identify when NuStar supposedly hired undocumented workers. They're going to have to identify when this happened.

And the first witness that they identify is somebody who's a woman or a man -- we think it's a woman -- who's supposedly highly connected in the Sibley, Iowa, Hispanic community. And this person doesn't identify -- and she s -- and the source apparently told us that she sent workers to the farm and the -- Tony Nunes, Anthony Nunes Junior, was aware of their illegal status, unauthorized status. But they don't tell you when.

And so my object -- so my -- so then I went to the second source for context. And the second source then says that he was there for roughly several years and he left recently. That's all they tell you about this second source.

So our response was that the document production, that the interrogatories need to be -- there needs to be context here. It's not -- it's unreasonable and overbroad for the defendants to request us to produce hiring records in 2006 because the defendants don't claim -- and I have never heard it. They don't claim that the article's about something that happened in 2006 or 7 or 8 or 9. In fact, the only -- the only temporal context, Judge, is several years, this second source,

several years.  There's no other context in the article.

       So I proposed to produce records from 2015 to the
end of 2018 because, of course, the period from October 1
to the present is irrelevant.  It doesn't matter.  The
article's already published.

       So we objected on the grounds of relevance and,
again, I would suggest proportionality of the needs --
there's no need to produce any records from October of
2018 forward because they could have no bearing on what's
at issue in this case.

       That's my position on relevance and proportionality.
I proposed 2015, 2016, 2017, and the first 3 months of --
first 9 months of 2018 because that's relevant to what is
written in the article.  That's what the article is
about.  It couldn't be about more because they don't have
any sources who supposedly have knowledge of illegal
hiring practices in 2006.  It just seems to me, Judge,
that that's way too -- the discovery as phrased is way
too broad.  And to require my clients to go back and look
for hiring records, bank records, and financial
statements and things back to 2006 is unreasonable.
That's our position there.

       Now, to address Mr. Boyer's question, it is.  It's a
substantial burden to go back and look for 14-year-old
bank records.  And I would submit, Judge, that they're

1  not going to show anything anyway.  What are they going

2  to show?  Somebody paid for some gas, if they show

3  anything.  Somebody paid a wage check.  They're going to

4  get all the other -- from the bank statements.  They're

5  going to get all that information from other documents.

6      So I would submit that the time frame, the temporal

7  issue here, needs to be -- the defendants need to tell

8  the Court what's the time frame that's relevant to your

9  defense?  What's the time frame?  It couldn't be '06 when

10  NuStar was formed.  It couldn't be '07 or '08 or '09.

11      And so we would ask the Court to limit the -- limit

12  the discovery to a time frame that is related, reasonably

13  related, to the allegations in the article itself.

14  That's I think on the -- that's my response on the

15  temporal one.

16      And it is a -- I don't know -- I can't tell the

17  Court and I can't tell opposing counsel how far back they

18  retain documents.  They may have a retention policy.  I

19  don't know what it is right now because I haven't

20  addressed that with them.  But there may be a retention

21  policy.  It may very well be that they only have

22  documents going back seven years  I'm guessing, seven

23  years, ten years.  I don't know what their retention

24  policy or what the -- what the law requires them to do.

25  But, again, Judge, I think it needs to be -- we need to

```
 1   have discovery tailored in this case.

 2            THE COURT:  Well --

 3            MR. BISS:  And to further address Mr. Boyer's

 4   question, is there -- is there a burden for producing the

 5   I-9s or the Iowa wage reports, these are not lengthy

 6   documents, Judge.  I mean, I'm not going to tell the

 7   Court there is a -- there's a burden to have NuStar

 8   forward -- forward the documents, these documents, to me

 9   or the accountant forward the tax return.  I'm not going

10   to tell the Court that because we live in an electronic

11   age.

12        But I would suggest, Judge, that in terms of the

13   pragmatic, the practicality of this litigation, the

14   disc -- we shouldn't have to go and produce documents

15   that don't have any bearing on the issues -- the issues

16   as they relate to this particular article.

17            THE COURT:  Okay.  Thank you, Mr. Biss.  I

18   guess with respect to the relevance of it, I guess I'm

19   not really buying your argument about that.

20        In terms of the proportionality, since you don't

21   quite know at this point what records they really have,

22   I'm not sure that you've established that I -- that

23   there's a burden or some documents that seem to be fairly

24   easily produced.

25        So I guess at least a crystal ball reading on the
```

1  time period at this point is that I don't -- I don't

2  think that objection is valid.

3      In terms of the proposed redactions, I think we

4  discussed that in terms of what the protective order

5  would be and the need to keep those -- that information

6  secure.  I think it's obvious to everybody, but I think,

7  you know, redacting them, the records, doesn't seem

8  appropriate if they're otherwise secure.  They will need

9  to be redacted if anything's filed or be filed under seal

10  to make sure that those records, those Social Security

11  numbers, et cetera, stay confidential.

12      The records concerning the subsidies, I know that --

13  new one for me.  It seems the crystal ball is a bit

14  cloudy on that.  You want to address that a little bit

15  for me, Mr. Boyer?

16          MR. BOYER:  Certainly, Your Honor.  My

17  understanding is that when it comes to applications or

18  (insufficient audio) applications for stimulus

19  (insufficient audio) including stimulus applications or

20  stimulus funds related to COVID or whatever it may be,

21  businesses have to make representations concerning what

22  their workforce is, the number of people in their

23  workforce, associated expenses, et cetera.

24      This is an opportunity -- in this situation where we

25  have a significant dispute about truth or falsity of the

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Court Reporter - Electronic Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 28 of 48

```
 1   reporting and it goes to questions as to who was on the

 2   workforce, how many people are on the workforce, who are

 3   they representing, what context are their workers, this

 4   is a -- what we think to be a not difficult to deduce,

 5   readily ascertainable, and presumably a pretty discrete

 6   batch of documents in the form of applications and

 7   whatever related documents in response that they got that

 8   would allow us to review and then corroborate that

 9   against the other underlying employment records that they

10   were producing.

11       That's what we're trying to accomplish with the

12   subsidies.  That's why we say it goes to the truth --

13   subsidy and stimulus fund documents.  That's why we say

14   it goes to the truth or falsity, and we think it's,

15   again, a reasonable request, not disproportionate, should

16   not be an undue burden, and would, of course, be treated

17   with the -- I mean, actually some of these things

18   ultimately (insufficient audio) filed with government

19   authorities and what not but still where appropriate

20   would be treated with the utmost care as necessary.

21           THE COURT:  Well, why wouldn't just the

22   portions of those records that particularly pertain to

23   the labor force and roster of employees as opposed to,

24   you know, payments that the plaintiffs have received and,

25   you know, I guess my concern is whether this is news
```

1  gathering or this is related to the lawsuit.  Maybe

2  that's not the best, most diplomatic way to put it.  But

3  part of it seems to be related to the labor force and

4  roster of employees but maybe not what stimulus funds or

5  subsidies that the plaintiffs have received.  Maybe those

6  could be provided without providing all of the documents

7  you've requested.  At least that's what occurs to me

8  reading this.

9        Mr. Biss, did you want to address this one?

10        MR. BISS:  Sure, Judge.  I don't think it's

11  relevant at all.  I mean, how could -- how could

12  something that happened in 2020, COVID payments, PPP

13  payments, how could that be relevant at all to this case?

14  I mean, that's like -- that's like saying that next year

15  if we have a COVID 2 that if they apply for something

16  next year that's going to be relevant as well and I would

17  need to supplement.  It has no bearing on this case.

18        So none of these issues, none of these documents,

19  subsidies are relevant at all.  Their labor force right

20  now is not relevant.  It's not relevant to what the

21  article is all about.  It has no -- no bearing on it

22  whatsoever.  And -- and it's completely cumulative.  This

23  information is cumulative of the other documents, that

24  is, the documents that they had requested, I-9s, wage

25  reports, and other documents.  It's just -- it's

```
 1   completely cumulative.

 2         And so I would object on the grounds of, number one,

 3   it's not relevant to this case at all.  And number two,

 4   it's completely cumulative.  And its relevance, Judge,

 5   even if it is relevant, even if what hap -- what their

 6   workforce is in 2020 is relevant, it's marginal.  It's so

 7   marginal.  The relevance is so marginal of these

 8   documents themselves.

 9         For instance, Your Honor pointed out that -- you

10   know, how much money -- if they got money, how much money

11   they got, how much -- what they made -- what their PPP

12   applications say, these types of things.  It's just --

13   it's just so marginally relevant that I would suggest

14   that it really -- we're really going very far away from

15   the concept of proportionality under 26(b)(1).  And I

16   would ask just the Court to consider that.  I mean, Your

17   Honor -- Your Honor I think alluded to this -- the

18   question whether this is just part of current news

19   gathering, whether there's some issue that someone's

20   going to write an article about how much PPP money was

21   paid to NuStar.  I mean, again, they could have written

22   that article earlier this year.

23               THE COURT:  Yeah, I probably shouldn't have --

24   I didn't mean to even inadvertently suggest that the

25   lawyers involved in this case are involved in news
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Court Reporter - U.S. District Court Transcript*

Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 31 of 48

```
 1  gathering.  That wasn't fair of me.
 2      Mr. --
 3          MR. BISS:  And I didn't hear you to suggest
 4  that, Judge.  My suggestion is, look, if it's a
 5  newsworthy event and it's newsworthy, that's a totally
 6  different issue than whether or not it's relevant to the
 7  issues in this case.  This case involves an article
 8  published in 2018.  It doesn't involve PPP application
 9  and payments from the COVID fund or whatever it's called
10  in 2020.  It's just -- it's just -- to me there's just no
11  connection whatsoever between the two of them.  And
12  requiring, you know, my clients to go -- go locate these
13  documents and produce them, again, is -- it's burdensome.
14  And, again, there has to be sort of a connection between
15  the burden and the relevance, and here there's just no
16  relevance.
17          THE COURT:  Mr. Boyer, do you mind --
18          MR. BISS:  You know, and again, I would ask the
19  Court to consider that in terms of the production of
20  documents in this case because there's been a hundred so
21  far -- over a hundred requests for production of
22  documents.  It's a huge, huge, huge undertaking.  And
23  basically we're going to be producing everything that we
24  have that's relevant to the issues of whether or not
25  NuStar hired illegal workers.  That's really the issue
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Court Direct Computer-Aided Transcription*

Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 32 of 48

1    and whether they knew it.

2        But the PPP stuff in 2020 doesn't really help us,

3    doesn't really help them at all.  It's not going to --

4    even if it shows the workforce, it doesn't really get to

5    what the issues are in this case.  So that's my response,

6    Your Honor.  Thank you.

7            THE COURT:  Mr. Boyer, if you could maybe just

8    briefly address so I understand how sort of post-article

9    records of subsidies or PPE purchases might be relevant

10   to the case.

11           MR. BOYER:  Absolutely, Your Honor.  And there

12   are two reasons that it's relevant to the case.  First,

13   it's to the financial performance after -- after the

14   article ran which goes to the damages.  I was taking a

15   look earlier today at plaintiffs' initial disclosures.

16   They claim, if I'm not mistaken, something to the tune of

17   25 million dollars in -- I think it was economic, slash

18   reputational injury.  We have the abil -- we need to

19   understand the extent to which their business has

20   sustained damage (insufficient audio) if it has at all

21   since publication of the article and what representations

22   they've made about the cause of any drops in performance.

23       So right off the bat, the financial information

24   that's reflected in PPP applications would go directly to

25   that issue of damages.  That's one point.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Transcription
Case 5:20-cv-04003-CJW-MAR  Document 67  Filed 01/12/21  Page 33 of 48

```
1       Another point is that representations (insufficient
2   audio) that would be in a post-publication (insufficient
3   audio) would also speak to the truth or falsity of the --
4   of the underlying allegation -- ex -- of the reporting,
5   excuse me.  The representations concerning the workforce
6   in 2019 or 2020, assuming the workforce would be
7   relatively stable over time, should align with
8   representations previously, and it gets back to the point
9   about corroborating and understanding and confirming the
10  accuracy of the documents we receive about the workforce
11  at the time of the publication.
12      I would also note that if there happens to be some
13  sort of sea change in who's working and what the roster
14  of employees are or who's being represented to what, that
15  raises very interesting questions that are worth
16  exploration as well in this case in which the question is
17  whether the workers are undocumented.  And that is going
18  to almost certainly be proven by circumstantial evidence
19  that's going to be derived in this case.
20      These inconsistencies across financial documents are
21  going to be highly relevant to that.  And the mere fact
22  that a document happens to have been created after 2018
23  doesn't mean that it isn't probative or relevant to what
24  the state of affairs was as to the date of publication in
25  2018.
```

Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov
Computerized Court Reporting Transcript
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 34 of 48

1    It's also an interesting question which we've been

2  trying to grapple with over here, and I think it's --

3  it's that if -- if we were to develop evidence in this

4  case that there was some sort of change in the workforce

5  after (insufficient audio) change in the workforce

6  demonstrated that there were undocumented workers, it

7  raises another damages question as to the extent to which

8  plaintiff was damaged by the publication as opposed to

9  what they ultimately ended up coming to pass.

10    But that's sort of a tertiary issue.  I think these

11  documents are squarely issue -- squarely relevant both

12  for the damages point, and they are squarely relevant to

13  our corroborating statement (insufficient audio) as of

14  September 30, 2018, the date of publication.

15    THE COURT:  Okay.  Thank you, Mr. Boyer.  You

16  make good points about why those records would be

17  pertinent to cal -- things like calculation of damages

18  and conceivably even about what the workforce was in the

19  relevant time period.  So I would -- I would be inclined

20  to permit discovery of those as well as the bank

21  statements relate to damages and the other issues

22  mentioned here in the correspondence.

23    I apologize I'm moving on a little -- trying to move

24  on a little more quickly here for some other time

25  constraints I have.  But turning to the issues bearing on

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Court Use Only - Official Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/23   Page 35 of 48

1   the plaintiffs' reputation, I think the time period

2   again, I think likely to be appropriate as well as the

3   customer list and trade organizations, you know, I know

4   health and medical records are certainly sensitive, and I

5   guess to the extent that they're make -- the plaintiffs

6   are making claims that they suffered mental anguish or

7   suffered any physical conditions, generally the Iowa law

8   permits for discovery of those.  And there are cases I'm

9   aware of where the plaintiffs choose to stipulate that

10  they're not seeking those sort of damages and then the

11  parties agree or the Court can order that that wouldn't

12  be relevant.  But if they are making those claims, then

13  there's some legitimate inquiry that can be made into

14  those -- into those records.

15       Turning to the trade organizations, I guess that

16  would be something that I would think the inquiry would

17  be legitimate.  You know, the one thing I've got a big

18  question mark here in my notes is this about the funders

19  of the action.  And I'll just tell you my crystal ball is

20  very -- is blank on this one.  I think I -- this looks

21  like a sensitive topic that you could approach from a

22  number of angles.  It's new to me, and I'm not going to

23  suggest to either party that I have the answer to that at

24  my fingertips.  And I don't think it's been briefed, and

25  I don't think I'm going to invite Mr. Biss to have to

 1  deal with this one on the fly where he hasn't written a

 2  specific response that I've seen.  It's probably

 3  something more complicated than we can probably take up

 4  at this conference today.

 5      So I'm going to kind of leave that one for the

 6  parties to further meet and confer if they can and try to

 7  resolve it.  And if they can't, it might be something

 8  that you're going to have to brief.

 9          MR. BISS:  Judge, this is Steve Biss.  May I be

10  briefly heard on that?

11          THE COURT:  You certainly may.

12          MR. BISS:  Judge, this is not a case where the

13  plaintiffs are requesting attorneys' fees or they can

14  recover attorneys' fees under Iowa law at all.  So why

15  would the identity of anyone, if there is someone who's

16  funding the litigation, why would it be -- why would it

17  have any relevance at all?  There's no contract that

18  provides for attorneys' fees.  There's no statute.  It's

19  a common law defamation claim.

20      I mean, I understand there's a prurient interest

21  across the country as to who is paying legal fees to me.

22  And when we talked about this on Saturday, I suggested to

23  counsel in sort of a joking way but they could go -- they

24  could go look at various Twitter accounts that have been

25  set up.  For instance, there's one called Devin Lawsuits,

     1    and all these people do all day is wonder and speculate

     2    about who's paying legal fees to me.

     3        But that prurient interest or that speculative

     4    interest out there in the world as to who maybe is paying

     5    me legal fees, in this case, in the case that we're here

     6    for, thankfully, it's not relevant.  It doesn't matter

     7    because my clients aren't going to be entitled to -- are

     8    not requesting and are not going to be entitled to the

     9    payment of their legal fees.  I mean, I wish they were.

    10    But they're not -- they're not -- in this particular case

    11    they're not.

    12        So that request should be struck -- that request

    13    should not be granted.  I mean, the -- some of the --

    14    I've heard here, Your Honor, some of the documents -- and

    15    we'll produce what we have on the subsidies and on trade

    16    organizations to the extent any of this exists.  But

    17    they're really on a fishing expedition on a lot of this

    18    stuff and especially on the funding.  It's not even a

    19    fishing expedition for documents that could be calculated

    20    to lead to the discovery of admissible evidence in the

    21    case.

    22        So I just want to make that response.  And I would

    23    like to reserve the right to do some research on it if

    24    necessary.  But I think that's an easy one to see that

    25    they're -- that that's just speculative, that it doesn't

```
 1   really have any relevance to damages.  It doesn't have
 2   any relevance to any issue in the case, couldn't help
 3   them at all.
 4          THE COURT:  Well, I will -- I will say this.  I
 5   try to think about all the lawsuits that I worked on for
 6   25 years in pra -- private practice and cases I was
 7   really curious about how the other side was getting paid
 8   or what the other side was getting paid.  But I don't
 9   think I ever was able to formulate a legitimate basis to
10   force them to tell me who was paying or how they were
11   getting paid.  And that's one of the reasons I'm saying
12   that my crystal ball doesn't tell me anything about how
13   this comes out.  I'll just say it's a rare animal as far
14   as I recall, but I'm not going to try to resolve it
15   today.  That's for sure.
16      Is -- and I guess I -- you know, to be clear here, I
17   told you how I'm likely to rule, and so I hope you can
18   use that in your further discussions, your meet and
19   confer and overcoming some of these discovery hurdles so
20   you can narrow down the issues.  But I guess I would try
21   to be clear I haven't ruled formally on any of the
22   objections that are being made to those issues we just
23   talked about.
24      I'm at the end of Mr. Boyer's letter, and I just
25   want to make sure that there wasn't something else that
```

1   people thought we were going to visit about this morning

2   that I've missed.  On behalf of the plaintiff, was there

3   something else that you thought we were going to take up

4   today?

5          MR. BISS:  No.  I think the only -- the last

6   point would be this, Judge, and again, in terms of the

7   plaintiffs' position on the scheduling order was, you

8   know, we do -- we are suffering damage every day.  We

9   made this argument to the Court before.  Every day this

10  article remains up, we're getting threats.  We're getting

11  more and more Twitter -- publications on Twitter about

12  how we're breaking the law and things like that.  And

13  that -- that does go directly to our damages.

14      I just want to get a sense of when we could get

15  documents, when we could start getting documents flowing.

16  I mean, I know the Court's going to work on that -- that

17  sched -- on the protective order.  But I think at this

18  point in time we can anticipate that the scheduling or --

19  the protective order's going to be entered.  And I just

20  wanted to get a sense of when the Court would like us to

21  start getting these documents flowing back and forth.  We

22  can start a rolling production between counsel but -- of

23  certain documents, but we'd like to get going with the

24  documents.  We'd like to get deposition dates set in

25  place.  Counsel's schedule always -- you know, they're

*Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov*
*Court Reporter - Official Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 40 of 48

 1  always -- they always change almost on a daily basis.

 2  Mine does.  But, you know, we'd like to go ahead and get

 3  some deposition dates scheduled, and that was part of our

 4  motion.

 5       Again, I mean, there are some issues that we're

 6  going to have to keep talking about.  But -- and there

 7  are some things that I think we can -- we can -- you

 8  know, counsel can get together and get deposition dates

 9  scheduled and that type of thing.  So that would be the

10  only thing that I would add to the conversation.

11            THE COURT:  All right.  Thank you, Mr. Biss.

12  In terms of me getting a protective order out, I'm hoping

13  to get that out before the end of the week or early next

14  week.  Depends on when I can get to it.  And it's

15  probably going to look much like what you've seen or

16  consistent with what we've talked about this morning.

17       In terms of when you're going to get those documents

18  flowing, I know you've got your concerns about the

19  security of those documents.  And so I suppose you're

20  going to have to get that sorted out to some extent.

21  Maybe there are some categories of documents that are

22  less sensitive than others, and those can move sooner.

23       I would guess that you're each going to want to have

24  reviewed the other party's documents to some extent for

25  certain depositions.  But I encourage people to get --

 1   get right after it.  Every minute I spent in private

 2   practice arguing about whose deposition should go first

 3   was a complete waste of time.

 4        I'll also encourage the parties to use Zoom or

 5   whatever video platform they can make use of during the

 6   pandemic.  The people are using that all over now for

 7   their depositions, and I've been encouraging it for

 8   months and telling people that it's not going to be an

 9   excuse to get an extension of discovery deadlines if you

10   haven't been using technology to overcome the coronavirus

11   impediments to it.

12        So I can't give anything more specific about when

13   your depositions are going to start, Mr. Biss, but I

14   think the sooner the better and the sooner the better

15   also for the documents as soon as you can get the

16   precautions in place.

17        For the defendants, is there anything else that you

18   thought we were going to visit about this morning?

19             MR. GIUDICESSI:  Go ahead, Nate.  Judge, this

20   is Mike Giudicessi.  I'll follow up after Nate.

21             MR. BOYER:  Oh, thank you, sir.  Your Honor, a

22   couple points.  One, not only do we share plaintiffs'

23   eagerness to get going on document production, but we're

24   extremely eager to see plaintiffs' documents.  So I'm

25   happy to hear that both sides are aligned on moving

1    quickly, and we'll be reaching out to Mr. Biss to make

2    sure we got everything lined up there and we're producing

3    and getting the ball rolling as soon as possible is one

4    thing.

5        Second thing, there were a couple things at the end

6    of the letter that were worth just making sure we talked

7    about before we closed up conversation.  The first was

8    the first paragraph under a section called Updated

9    Responses.

10       I take from what happened here today that there

11   might be some value -- well, I guess it all turns on if

12   plaintiffs agree with where things are.  First of all,

13   there might be some value in plaintiff updating and

14   revising -- or plaintiffs updating and revising their

15   responses so that they correspond to what the likely

16   outcome is here assuming it doesn't result in motion

17   practice.

18       But I guess that's one question I just want to make

19   sure the Court or see if the Court agrees with that if

20   plaintiff should revise their response and objections to

21   correspond to things like time frame if, in fact, the

22   parties are going to proceed on that ground based on the

23   guidance we got here today.

24       And then the second thing is that the last

25   paragraph -- and this is something which I've never done

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Computerized Litigation Support Transcript*

Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 43 of 48

```
 1    before in a case and I appreciate's unusual.  But we are
 2    a little concerned on the defendants' side that this case
 3    could use a little bit of guidance throughout discovery
 4    and there might be some wisdom to having status
 5    conferences on the schedule as we go.  I would certainly
 6    defer to the Court, obviously defer to the Court on
 7    whatever the Court wants to do there.  But I at least
 8    wanted to make sure the Court saw that note in our letter
 9    at the very end to see if the Court thinks there's value
10    in putting status conferences on the calendar on a
11    periodic basis throughout the course of discovery here.
12            THE COURT:  Okay.  Thank you for those
13    suggestions.  First in terms of the updated responses,
14    I'll leave that to Mr. Biss's discretion.  They're his
15    responses.  I made probably some fairly helpful
16    predictions I hope about what would happen and what
17    objections I might uphold.  But as I told him, you know,
18    he has a right to brief those if he thinks he needs to
19    and doesn't necessarily have to believe the readings in
20    the crystal ball so -- but, you know, use his
21    professional judgment I assume, and he'll update those to
22    narrow down the issues as far as he thinks he can.
23        I have not routinely scheduled or put periodic
24    scheduling conferences.  This case might warrant it, and
25    I'll give that some further thought.  It's been my
```

```
 1   practice to hold them as needed usually when I'm alerted

 2   by counsel that we need to.  But maybe this case merits

 3   that, and I'll think about it further.

 4        One other thing that occurred to me while you were

 5   talking, Mr. Boyer, do the parties agree that the motion

 6   to compel can be denied without prejudice to refiling as

 7   moot based on the parties having met and conferred on it?

 8             MR. BISS:  Judge, this is Steve Biss.

 9   There's -- yes, with one -- with only one caveat, and

10   that is the privilege list.  They still have not produced

11   a privileged list.  My understanding is in addition to

12   documents that they are going to -- that they are going

13   to produce pursuant to the protective order, they are

14   going to withhold some documents, and I think the one

15   category I remember is apparently there were attorneys

16   involved in the drafting of the article or the editing of

17   the article before it was published.  So there may be

18   documents they withhold (insufficient audio) privilege.

19   And I would ask the Court to direct them to file -- any

20   privileges they're going to produce to file that within

21   ten days.  It seems to me there's been plenty of time to

22   get a good handle on documents that are going to be

23   withheld.  So that's the only part of the motion to

24   compel that is -- sort of from my perspective remains

25   unresolved.
```

*Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov*
*Court Produced Official Court Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 45 of 48

         THE COURT:  Is that a reasonable time frame to
get a privileged list put together, Mr. Boyer?
         MR. BOYER:  When it comes to -- yes,
(insufficient audio) clear.  The document requests at
issue that are the subject of -- with one -- there's two
requests that are addressed to Hearst.  The vast majority
of the questions were addressed to Mr. Lizza who is not
with Hearst and at the relevant time was engaged as a
freelancer.

    I see no problem with getting a privileged log out
for Mr. Lizza within ten days.  And to be honest, as I
sit here right now, I don't even know if we have anything
at this point that will be logged in light of the
resolutions of the issues concerning reporter's
privilege.  So that's Mr. Lizza.

    With regard to Hearst, we'd ask for a little more
time.  For one, there are only two requests that concern
Hearst, and it's not entirely clear that they would have
all (insufficient audio) documents.  There were follow-on
requests that were addressed to Hearst which we've been
responding to.  Tuesday we got some responses out.  We
have some on Friday.  We're actively gathering documents
preparing them for production.  For Hearst I might
request something closer to 21 days in order to get out
the privileged log, and that would be helpful on our

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@ianc.uscourts.gov*
*Court Reporter - Official Transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 46 of 48

1   side.

2              THE COURT:  Okay.

3              MR. BISS:  Judge, I agree with that.  I think

4   that's reasonable.

5              THE COURT:  All right.  So the order with

6   respect to the motion to compel, we'll simply deny it as

7   moot based on the parties meeting and conferring and

8   the -- an order that the Defendant Lizza will provide a

9   privileged log within 10 days and Defendant Hearst within

10  21 days.  So I think that wraps up that piece of it.

11       Mr. Giudicessi, did you still have something that

12  you wanted to ask or share with the group?

13             MR. GIUDICESSI:  Yes, Your Honor.  And I'll be

14  very brief.  Thank you.  And by the way, thank you for

15  extending this and dealing with all these issues for us.

16  The crystal ball's very helpful to both sides I think.

17       When we -- when we drafted the protective order, we

18  thought that paragraph 14 would permit either side to

19  make future filings under seal without a separate motion

20  as required by the local rule.  I think we just want to

21  make sure that as we go forward that we're doing it in

22  the way that you would like us to and that the rules

23  require us to.

24       So the question is do we need to make any future

25  filings under seal with a separate motion to seal, or may

*Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov*
*Computerized Court Reporting / Transcript*

Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/23   Page 47 of 48

1 we simply file them under seal and reference the

2 protective order?

3          THE COURT:  I think you can do the latter

4 safely.  I'm looking at paragraph 14.

5          MR. GIUDICESSI:  Perfect.  Thank you, Your

6 Honor.

7          THE COURT:  You're welcome.  I'm thinking of

8 retiring my crystal ball.  I think everybody's getting

9 tired of that analogy.  I'm going to get out some tea

10 leaves or a Ouija board for the next one of these.

11          MR. BISS:  I like crystal ball, Your Honor.  I

12 think that's a good one.

13          THE COURT:  All right.  Maybe I'll -- maybe

14 I'll keep it.

15      All right.  Thanks, everybody, for your time this

16 morning.  I think it's been productive, and we can get

17 back together as needed, and I'll give some thought to

18 scheduling regular monthly meetings for us.  But that

19 will conclude our hearing.  Thanks.

20          (The hearing was concluded at 10:07 a.m.)

21

                      CERTIFICATE
22      I certify that the foregoing is a correct
   transcript to the best of my ability from the digital
23 recording of proceedings in the above-entitled matter.
       S/Shelly Semmler                  1-9-21
24     Shelly Semmler, RMR, CRR            Date

25

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Your document complete digital transcript*
Case 5:20-cv-04003-CJW-MAR   Document 67   Filed 01/12/21   Page 48 of 48